FILED by _____ D.C.
ELECTRONIC

**Oct 13 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

EUGENIO GARCIA,

      Plaintiff,

vs.                                       **CASE NO. 04-22640 CIV-JORDAN**

PORT ROYALE TRADING CO., INC.,
LOUISE LYNCH, and OASIS
OUTSOURCING, INC.,

      Defendants.

_____/

## DEFENDANTS' STATEMENT OF FACTS
## IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

      Defendants, Port Royale Trading Co., Inc., Louise Lynch, and Oasis Outsourcing, Inc., by and through their undersigned attorneys, and pursuant to Rule 56(b), Fed.R.Civ.P., and Rule 7.5(c) of the Local Rules for the United States District Court for the Southern District of Florida, hereby submit their Statement of Facts in Support of their Motions for Summary Judgment.

      1.      Defendant Port Royale Trading Company ("Port Royale") distributes seafood to restaurants throughout the State of Florida. [Nichols: 13(22-24), 19(15-16)] [Garcia: 48(18-20)]. Richard Nichols ("Nichols"), one of the corporate owners, runs the day-to-day operations of Port Royale. He is in charge of the sales staff, the warehouse staff and the truck drivers. [Lynch: 7(9-13)].

      2.      Louise Lynch ("Lynch") is Port Royale' corporate secretary. [Lynch: 4(3-7)]. Lynch runs the inside office and oversees receivables. [Lynch: 5(5-15)]. Every week, Lynch reports the hours each employee works to the company that handles Port Royale's payroll processing. [Lynch: 7(13-23)]. Although she does not determine how much employees are to be paid, Lynch is also responsible for making sure that all employees receive a paycheck. [Lynch: 14(1-13)].

**28/SK**

3.      Oasis Outsourcing Inc. ("Oasis"), is a Professional Employer Organization which provides employment-related services to Port Royale. [McAllister: 4(17-25)].

4.      On February 15, 1997, Plaintiff was hired as a truck driver to work for Port Royale. [Garcia: Ex(s) 6 & 7].[1]  The position paid an hourly wage of $7.00 per hour.  *See Id.*  As a truck driver Plaintiff's hours varied each week. [Garcia: 51(23-35)].

5.      Plaintiff's supervisor was Nichols. [Lynch: 8(17-20)]. Nichols set the Plaintiff's work schedule. [Lynch: 15(4-8)]. And, Nichols set Plaintiff's compensation. [Lynch: 14(1-3)].

6.      On August 3, 2000, Port Royale entered into a Service Agreement with Oasis, whereby, in return for a fee, Oasis agreed to do the following on behalf of Port Royale: cut payroll checks on its own accounts for amounts dictated by Port Royale; pay the related taxes to the appropriate government agencies; pay workers' compensation premiums to a workers' compensation carrier; and pay unemployment taxes.  [McAllister: 4(14)-7(15)] [McAllister Aff: ¶2].  Port Royale had entered into similar arrangements with other leasing companies, such as Paychecks, prior to executing the Service Agreement with Oasis.  [Garcia: Ex. 6].  At that time, Plaintiff was still earning a wage of $7.00 an hour. [Garcia: Ex. 7].  Plaintiff was paid only for the hours he worked. Thus, if he worked only 27 hours in a week he would be paid $189 for that week. [Garcia: 42(11-13)] [McAllister Aff: ¶8].

7.      Port Royale, not Oasis, has exclusive control over its employees. [McAllister Aff: ¶¶4-6].  Any work performed by Port Royale's employees exclusively benefits Port Royale. [McAllister: 4(14-7(15)].  Plaintiff relied only on Port Royale for his economic livelihood.

---

[1]  Plaintiff was rehired on this date.  Previously, he worked as a driver for a company (Admiral) that was operated by the same persons that operated Port Royale.  Plaintiff resigned his employment from Admiral on July 12, 1996. [Garcia: Ex. 4].

-2-

[McAllister Aff: ¶¶4-6].

8.    Oasis is not a temporary help firm, which recruits, trains, places, manages and, at their discretion, fires or lays off employees.  Instead, Oasis is akin to a payroll company, cutting payroll checks, paying taxes, and performing similar administrative tasks for their clients. [McAllister Aff: ¶2].  These tasks are completed by Oasis with its client's money.  *See Id.*  In an arrangement such as that between Oasis and Port Royale, each pay period the client submits its employees' hours to Oasis.  Oasis computes the payroll as a service to its client and prepares checks for the benefit of the client employer. [McAllister Aff: ¶4].  Port Royale submits a payment to cover the payroll and an administrative fee to Oasis before payment is made to the employees working for Port Royale.  *See Id.*  If Port Royale ever failed to call in payroll or failed to supply funds to cover employee paychecks, the contract between it and Port Royale is breached and terminates.  *See Id.*  Payroll changes such as increases in pay, new hires, terminations, etc., are made by Port Royale and then provided to Oasis.  *See Id.*

9.    Port Royale solely and exclusively recruits, interviews, hires, trains, sets hours and schedules, determines the workweek, determines job descriptions, determines whether an employee will work overtime, manages the details, method and mode of work, determines wages and determines who will get a raise or promotion. [McAllister Aff: ¶5].  In addition, Port Royale solely determines whether leased employees will continue employment, whether unemployment compensation could or would be defended, determines the amount, if any, of severance pay to be offered upon termination, determines how much paid time off, bonuses or other benefits, and is responsible for maintaining a safe work environment.  *See Id.*

10.    Regardless of the contractual rights between Oasis and Port Royale, the actual

-3-

working relationship between the two parties is best described as follows:

      a.     Oasis never engaged in any direction or control of Port Royale's employees;

      b.     Oasis did not pay any of Port Royale's employees, until or when Port Royale paid Oasis to prepare the payroll checks;

      c.     Oasis does not have the authority to hire, fire or modify employees' working conditions at Port Royale;

      d.     Although Oasis could "fire" Port Royale's employees, the reality of the relationship of Oasis and Port Royale was that even if Oasis terminated a Port Royale employee, it had no right, power or authority to interrupt the ability of Port Royale to continue to utilize any leased employee or prohibit a leased employee from rendering services to Port Royale;

      e.     Port Royale remained in control of and exclusively active in safety, risk and hazard control of its facility;

      f.     Employment policies were promulgated in accordance with the reality of the relationship between Oasis and Port Royale, and were left up to Port Royale to enforce;

      g.     The reality of the relationship between Oasis and Port Royale was that either party could terminate the relationship, and in the event of such termination, Port Royale's employees would still work for Port Royale.

[McAllister Aff: ¶¶4-6].

11.     On June 18, 2001, Nichols contacted Paige McAllister, a Human Resource Administrator for Oasis, regarding the legality of changing the way he paid his truck drivers. [McAllister Aff: ¶¶ 2 & 7]. Port Royale's business fluctuated seasonally and Nichols wanted to pay

them a salary. *See Id.* Oasis contacted a wage and hour expert, Travis Campbell,[2] to discuss the legality of changing the truck drivers' compensation. [McAllister: 19(15)-21(12)].   After this consultation, Port Royale made the decision to pay its truck drivers pursuant to the FWW method of compensation. [Nichols: 4(13-16)].

12.    Nichols   gave   Plaintiff   the   Fixed   Salary   for   Fluctuating   Hours   Agreement ("Agreement"), and Plaintiff turned the Agreement into the accounting department. [Nichols: 6(6-9)].  Nichols also explained to Plaintiff that he was "going to get paid a salary of $350 and that the $350 was going to cover the straight time for all hours worked..." [Nichols: 6(20-23)][3].  He also informed Plaintiff that the $350 was a minimum salary:

> worked less than 40 hours he would still be paid a minimum of $350.  He was
> making at the time I believe $7.00 an hour, so, in effect, in the slower time he was
> getting like $7.00, it would be $280, he was now making 350.

[Nichols:6(25)-7(4)].  Nichols' assistant, Terrisita, also explained to Plaintiff that he was going to receive a set salary plus overtime.  [Garcia: 62(18)-63(5)].

13.    On November 27, 2001, Plaintiff executed the Agreement,[4] wherein he agreed to

---

[2] Campbell is the former head of the Division of Wage and Hour of the Federal Department of Labor in Baltimore, Maryland. [McAllister: 19(25)-20(2)].  His resume is attached to McAllister's Affidavit. [McAllister Aff: Ex. 2].

[3] Of the corrected deposition transcript.  All cites to Nichols deposition, encompass any corrections he made to the transcript.

[4] Plaintiff asserts that he did not understand the document because it was in English.  Plaintiff's claim that he could not understand English is contradicted by his testimony that he believes he is entitled to time and one-half based on "what I read in the Miami Herald." [Garcia: 71(6-7)].  The Miami Herald is an English language newspaper.  The Spanish newspaper published by the same company as the Miami Herald is called the El Nuevo Herald.  *See* http://subscriptions.herald.com.  Further, during his deposition, Plaintiff's counsel had to stop the deposition to direct his client not to respond to the questions in English, but to wait for the interpreter to translate the questions to Spanish before answering. [Garcia: 5(6-12)].  Even if we

work for a fixed salary, regardless of the number of hours he worked each week. And, he acknowledged understanding that the salary was to cover "whatever hours [he] actually worked in a given week." [Garcia: Ex. 8].

14.    Following the execution of the Agreement, Plaintiff began receiving $350 a week regardless of the number of hours worked. Thus, in a week where he worked only 32.75 hours he still received $350. [Garcia:42(14)-44(4)].

> Q:    You are still paid - - you are still paid the same amount even though you worked under 40 hours that week?
> A:    Yes, I understand that. I understand that. I understand that. I understand all of that.
> Q:    And that's different from before . . . when you were paid only the - - when you were only paid for the actual hours you worked?
> A:    Uh-huh. Yes. Yes. . .

[Garcia: 43(19)-44(3)].

15.    Plaintiff's regular rate under the FWW was initially determined by dividing his salary by the total number of hours he worked each week. [McAllister Aff: ¶9]. Plaintiff's overtime rate was one-half his regular rate, and as his hours increased, his regular rate and overtime pay decreased. For the paychecks issued from 12/7/01 to 6/21/02, this is how Plaintiff's half-time rate was calculated. *See Id.* In June of 2002, Oasis changed its computer systems. When this change occurred, Oasis' payroll program began calculating Plaintiff's half-time rate by dividing Plaintiff's salary by 40 instead of by all hours worked. As a consequence, his half-time rate was greater than it would have been before the payroll system changed. For the remaining years of his employment

---

accept his allegations that he did not understand, his claims will fail as his payroll records educated him on the method of payment. And, his claims will fail because he admitted understanding how he was being paid since he first received a paycheck where he was compensated pursuant to the FWW. [Garcia: 62(12-17)].

with Port Royale, this is how his overtime was calculated. [McAllister Aff: ¶10].

16.    On October 6, 2004, Plaintiff walked off the job after a dispute over a delivery. [Garcia: 60(1-25)].

17.    Plaintiff filed his Complaint on October 20, 2004, seeking compensation for the overtime hours that he did not receive time and one half for. [Garcia: 7(24)-8(1)].  Plaintiff admits that all the time he worked is reflected on his time cards.[5] [Garcia: 9(9-15)].  Plaintiff also admits that his paycheck stubs provide proof that Port Royale was paying half-time for all Plaintiff's overtime hours. [Garcia: 30(9-14)].  "These are the proofs that the checks were being sent to the bank. And it was also proof that what - - it was also proof that what they were paying, crap.  The overtime was crap."  *See Id.*  Plaintiff admits that he understood how he was being compensated since the first time he received a paycheck where he was compensated based on the FWW.  [Garcia: 62(12-17)].

Respectfully submitted this 13th day of October, 2005.

s/ Jennifer Fowler-Hermes
John M. Hament
Florida Bar No. 937770
Jennifer Fowler-Hermes
Florida Bar No. 0127442
KUNKEL MILLER & HAMENT
Counsel for Defendant
Orange Professional Centre
235 N. Orange Ave., Suite 200
Sarasota, Florida 34236
Telephone: 941-365-6006
Facsimile: 941-365-6209

---

[5] And, then some.  Rich Nichols testified that he allowed Plaintiff to clock in early. [Nichols: 11(15-23)].  Thus, Plaintiff's actual overtime hours as reflected on his time cards are inflated and Plaintiff received overtime compensation for hours he did not work.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2005, I electronically filed the foregoing with the Clerk of the Court by using the Southern District of Florida Electronic Filing System.  I further certify that I mailed a true and correct copy of the foregoing to: J.H. Zidell, Esq., 300 71st Street, #605, Miami Beach, Florida 33141, Attorney for Plaintiff.

s/ Jennifer Fowler-Hermes

-8-