IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 04-22640 CIV-JORDAN

EUGENIO GARCIA,

       Plaintiff,

v.

PORT ROYALE TRADING CO., INC.,
LOUISE LYNCH, and OASIS
OUTSOURCING, INC.

       Defendants.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT, PORT ROYALE TRADING CO., INC.'S, MOTION FOR SUMMARY JUDGMENT

COME NOW the Plaintiff, by and through undersigned counsel and states the following:

1.  Defendant, PORT ROYALE TRADING CO., INC., ("PORT ROYALE") filed their Motion for Summary Judgment and Incorporated Memorandum of Law, and Defendants' Statement of Facts in Support of their Motions for Summary Judgment on or about October 13, 2005.

2.  Defendant, PORT ROYALE, has filed with the Court and relied upon the deposition testimony of the Plaintiff, EUGENIO GARCIA, ("EUGENIO") and RICHARD NICHOLS, ("NICHOLS") part owner of PORT ROYALE, to assert that a clear mutual understanding was not entered into between EUGENIO and PORT ROYALE regarding application of the Fluctuating Work Week method of payment as to Plaintiff's wages.

3.  PORT ROYALE states that because this method is an alternative legal method of computing compensation, and not an exception to the traditional legal method of payment, Plaintiff bears the burden of showing that he was not properly compensated under the Fluctuating Workweek method of payment.

1



4.  PORT ROYALE contends that the Plaintiff cannot meet his burden and that the Plaintiff understood that he would receive his salary regardless of the number of hours he worked each week.

5.  Plaintiff will herein demonstrate that the Fluctuating Workweek method of payment does not apply because there did not exist a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours, pursuant to 29 C.F.R. 778.114(a).

## SUMMARY JUDGMENT STANDARD

The Defendant cites **Royas v. Florida,** 285 F.3d 1339, 1340 (11th Cir. 2002)(citing **Witter v. Delta Air Lines, Inc.,** 138 F.3d 1366, 1369 (11th Cir. 1998)), stating "summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party. Defendant states, however, "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." **Anderson v. Liberty Lobby, Inc.,** 477 U.S. 242, 252 (1986). The Anderson Court goes on to state, in part:

> The issue of material fact required by *Fed. R. Civ. P. 56(c)* to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. Id. at 249.

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. Id. at 255.

> We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial. Id. at 257.

## FACTUAL BACKGROUND

Plaintiff, EUGENIO, speaks a little bit of English, can write only a few words of English, and his highest level of education was approximately the 9th Grade. (SOF #1) EUGENIO first began working for Admiral Fish Company ten year ago, on or about February 7, 1995. (SOF #2)  EUGENIO was hired as a Driver/Warehouseman at $7.00 per hour with a minimum of 45 hours per week. (SOF #2)  PORT ROYALE was known as Port Royale and Admiral or Future Admiral when EUGENIO began on February 7, 1995. (SOF #2)

NICHOLS is currently one of the owners of PORT ROYALE.  NICHOLS has been employed at PORT ROYALE since May of 2000, and has been associated since 1988. (SOF #3)  Terrisita is NICHOLS' assistant. (Defendants' SOF #12)  The Plaintiff has always been an honest, hardworking, trustworthy, and credible employee for the Defendant. (SOF #4)

## MEMORANDUM OF LAW

The law regarding the Fluctuating Workweek method of payment can be drawn from 29 C.F.R. § 77.114 and applicable case law.  According to **Davis v. Friendly Express,** 2002 U.S. District Lexis 27098, in order to satisfy the fluctuating work week payment method, 1) the hours worked by the employee must fluctuate from week to week, 2) a fixed weekly salary must be provided to the employee regardless of the number of hours worked, 3) the fixed amount must be sufficient to provide compensation at a rate not less than the legal minimum wage, 4) there must be a clear, mutual understanding between the employee and the employer that the employee will be paid a fixed salary regardless of the number of hours worked, and 5) the employee must receive a 50 percent overtime premium in addition to the fixed weekly salary for all hours that the employee works in excess of 40 hours.  Flood v. New Hanover County, 125 F.3d 249, 251-252 (4th Cir. 1997).   Defendant cites **Davis** and **Myers v. Copper Cellar Corporation**, 192 F.3d 546 (6th Cir. 1999) stating the Eleventh Circuit finding that when an employer asserts that it compensated a Plaintiff based on the FWW, it is Plaintiff's burden to prove non-compliance with the FWW by a preponderance of the evidence.

It is the Plaintiff's contention that the clear, mutual understanding requirement set forth in **Davis** and codified by 29 C.F.R. § 77.114 did not exist between EUGENIO and

PORT ROYALE, thus obviating non-compliance with the FWW. The Court in **Monahan v. County of Chesterville,** 95 F.3d 1263, 1281 (4th Cir. 1996) states that section §778.114 places the burden on the employer to demonstrate the existence of such a clear, mutual understanding when the employer attempts to utilize the fluctuating work week method of payment.

## DEFENDANT'S ARGUMENTS

PORT ROYALE, as their first argument, points to the Fixed Salary for Fluctuating Hours Agreement (Exhibit A), and states: *In November 2001, he executed a Fixed Salary for Fluctuating Hours Agreement wherein he agreed to work for a fixed salary, regardless of the number of hours he worked each week, and acknowledged understanding that the salary was to cover 'whatever hours actually worked in a given week.'* EUGENIO stated in his deposition that the Fixed Salary for Fluctuating Hours Agreement was filled out by Terrisita, assistant to NICHOLS. (SOF#6) NICHOLS corroborates EUGENIO'S testimony that someone in the office filled out the Fixed Salary for Fluctuating Hours Agreement for him. (SOF #7)

PORT ROYALE, as their second argument, states: *Plaintiff admitted that he understood how he was being paid. He testified that after executing the agreement he received his salary regardless of the hours worked.* In support of this contention, PORT ROYALE posits the following deposition testimony of the Plaintiff [Garcia: 43(19)-44(3)]:

Q:      You are still paid- - you are still
        Paid the same amount even though you worked under 40 hours that week?
A:      Yes, I understand that. I understand that.
        I understand that. I understand all of that.
Q:      And that's different from before...when you were paid only the- - when
        you were only paid for the actual hours you worked?
A:      Uh-huh. Yes. Yes...

Defendant herein has **omitted** portions of the Plaintiff's deposition testimony in order to create the appearance that the Plaintiff understood on November 27, 2001 that he would be paid the same amount even though he worked under forty hours. EUGENIO'S deposition testimony reads at Page 43(13)-Page 44(4), in context, as follows: (Exhibit B)

Q:      **Do you see that for these four weeks that are now highlighted on your paper that the description of the pays says salary and under amount**

> **paid it is 350 in all four rows?  And do you notice that under hours,**
> **the second line says you only worked 32.75 hours?**
>
> A:      The same amount.
> Q:      You are still paid- - you are still
>         paid the same amount even though you worked under 40 hours that week?
> A:      Yes, I understand that.  I understand that.
>         I understand that.  I understand all of that.
> Q:      And that's different from before **when you**
>         **Looked at page 000289,** when you were only paid for
>         the- - where you were only paid for the actual hours
>         that you worked?
> A:      Uh-huh.  Yes.  Yes.  **But I don't understand**
>         **it.  This is too much.**

PORT ROYALE, as their third argument, states:   *He also testified that he understood he was receiving only half time for his overtime hours.*   In support of this contention, PORT ROYALE, posits the following deposition testimony of Plaintiff to infer his understanding [Garcia: 40(2-5)]:

> Q:      Well, if you take a look at your paycheck it will say regular pay $350.  And
>         Then it says half time.  Half time.
> A:      That's what I can't swallow.

PORT ROYALE'S third argument has no bearing on EUGENIO'S understanding or lack thereof on November 27, 2001, thru the present, that he would be paid a fixed salary regardless of the number of hours worked.  This excerpt is taken out of context and concerns EUGENIO'S present understanding of his time records on November 7, 2003, at the time of the deposition on March 24, 2005.  EUGENIO'S deposition testimony reads at Page 39(8)-Page 40(8) in context as follows:

> Q:      Let's go ahead and turn to the second page
>         Of Composite Exhibit 5 which has 000043 at the bottom.
>         And it indicates that the net pay is 348, $348.65.
>         Just to make sure we are looking at the same document.
>         If you can now turn to the fourth page of
>         Exhibit number 9 which the number in the corner- - the
>         Number in the corner is 000114.
>         It says here that the check- - the check
>         Date is 11-7-03 on- - we're looking at the second page
>         Of Exhibit 5.
>         Then if you look at the Oasis document,
>         You will see where it says pay date, 11-7-2003.
> **A:      Uh-huh.  Yes.  What happened?**
> Q:      Okay.  And on there it says that you had 40

|  | | Regular hours on number nine. And 12 and a half hours<br>Of overtime. And then it also gives a gross pay of<br>404.69. And the net pay of 348.65. You see that? |
| Page40 | A: | **What is that? What does this have to do** |
| Line1 | | **With anything?** |
| Line2 | Q: | Well, if you take a look at your pay check |
| Line3 | | it will say regular pay $350. And then it says half |
| Line4 | | time. Half time. |
| Line 5 | A: | **That's what I can't swallow.** |
| Line 6 | Q: | 54.69. 54.69. |
| | A: | **It doesn't even say the hours that you**<br>**Work. That's cheating.** |

PORT ROYALE'S fourth, fifth, and sixth arguments are themselves conclusory: *Despite the foregoing admissions on the part of the Plaintiff, during his deposition he also testified that he didn't understand. Such "after-the-fact" self serving conclusory allegations do not constitute credible evidence. Defendants made every reasonable effort to explain to the Plaintiff how he was to be paid. Not only did Nichols and his assistant, Terrisita, explain it to the Plaintiff, but Plaintiff executed an agreement stating he understood that he was going to be paid a fixed salary for fluctuating hours.*

## PLAINTIFF'S ARGUMENTS

EUGENIO, David Cardovie ("CARDOVIE"), and Juan Perez ("PEREZ") were each employed by PORT ROYALE, and each were compensated by PORT ROYALE pursuant to the Fluctuating Work Week (FWW) method of payment. EUGENIO, CARDOVIE, and PEREZ'S deposition testimony demonstrates that they understood and it was explained to them that they were to be compensated by the Defendant at an hourly rate for forty hours worked, and additionally paid half-time compensation based upon that hourly rate for hours worked over forty. PORT ROYALE has therefore compensated EUGENIO, CARDOVIE, and PEREZ improperly under the Fair Labor Standards Act.

PRINCIPLES FOR COMPUTING OVERTIME PAY BASED ON THE "REGULAR RATE." The Fixed Salary for Fluctuating Hours, 29 C.F.R. §778.114(a), states the following:

**Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, <u>rather than for working 40 hours or some other fixed weekly work period...</u>**

CARDOVIE worked for the Defendant from approximately January of 2001 thru July of 2005. CARDOVIE'S deposition testimony comments on his understanding of the FWW method of payment on Page 8, Line 20 thru Page 9, Line 14: (Exhibit C)

Q:  Do you understand how Port Royale Trading
    Company' overtime payment to the driver is? Do
    You understand the system?

A:  **No. When we was working, when we were
    Working, we was earning seven dollars plus overtime
    Time half. Seven dollars, overtime 10.30. But
    Later, they did maybe a contract. I don't know. A
    Paper. We have to sign. They told us that we have
    To work five days, you know. That it was the
    Contract, five days. If you want to work five
    Days, if you want to earn 350 per week, okay. Five days is good.
    But after that when we sign, sometimes in
    The evening, yes, we were working five days, but
    Then we were short drivers, we work six days.
    When somebody take a vacation, we work six days,
    You know. In the year, I count maybe three or
    Four where they gave us five days of work every
    Week depending. But if we were short a driver, we worked six days.**

When questioned regarding "exactly what Teresa told you when she gave you that contract for the $350 a week." CARDOVIE stated on Page 10, Line 19 - Page 12, Line 4:

A:  **She told me, you have to sign this. It's
    A new contract. You are getting to earn $350 per
    Week. You are going to work five days, and the pay
    Is going to be $8.75.**

Q:  An hour?

A:  **Yes. Okay. I told her okay. It's not
    Bad. But she told me in that case, but the
    Overtime- - the bad is the overtime is half time.
    What could I do? You have to sign this. In the
    First time they was paying less than the amount.
    But we didn't sign that, you know. But in the
    Meantime, we were obligated. I don't know how to
    Say in English. We had to do. If you don't do,
    You are fired.**

Q:  Let me ask you this. When Teresa from
    The company told you that you would get paid half
    Time for your overtime hours under this system,
    What did you understand that to mean? What did
    That mean to you?

A:  **That the overtime- - one hour overtime is**

7

|    | **Going to be $4.35, because it's the half money of**<br>**The eight dollars per hour and 75 cents.** |
|----|---|
| Q: | Did Teresa tell you that when you work<br>More overtime hours, then you get less than half time? |
| **A:** | **No.** |
| Q: | Did you understand the contract that was<br>Given to you by the company for the $350 a week to<br>Mean that the more overtime- -<br>Ms. Hermes:  Objection. |
| Q: | - - that you worked, that the less half<br>Time you would get for more overtime hours worked? |
| **A:** | **In that case, she didn't tell us, because**<br>**In the moment it was new, you know, it was new**<br>**Idea.  For us, it was strange because we never were**<br>**Like that because the overtime always is one time**<br>**And a half.** |

CARDOVIE'S testimony demonstrates his understanding that he was being paid $8.75 an hour for a fixed salary of $350, or inferentially for 40 hours per week, and not a fixed salary for all hours worked.

PEREZ'S testimony supports CARDOVIE'S testimony that the FWW method of payment implemented by the Defendant contemplated a fixed salary for a (40) forty-hour workweek.  When frankly questioned, "Tell me this.  How much were you paid as a driver for the company?", PEREZ replied on Page 7(1) - Page 8(23): (Exhibit D)

| **A:** | **Like I told you, 350 based on 40 hours,**<br>**But if you do 30 hours or 25 or 32, you will get**<br>**Your 350 based on 40.  If I will go over 40, it**<br>**Will be half time.  Anything after 40 hours will be**<br>**A half time pay.  Below 40 hours, how many hours**<br>**You did, you will get your 350 or whatever was your**<br>**Salary base, your salary.** |
|----|---|
| Q: | Over 40 hours- - |
| **A:** | **Will be a half time pay.** |
| Q: | So explain to me, if you would- - let's<br>Take a workweek- - if you need a calculator, I can<br>Get if for you. |
| A: | Sure. |
| Q: | Let's take a workweek that you actually<br>Worked the 45 hours that you testified to earlier.<br>Okay?  Do you follow? |
| A: | Yes. |
| Q: | You were getting paid 350 for that<br>Particular week, right? |

A:     Correct.

Q:     How much would you get paid for those
Extra five hours?

**A:     Those hours, it would be half time pay.**

Q:     Half time of what?

**A:     If you divide 350 into 40, you come out
To like 8.65 an hour, right?**

Q:     Hold on.  Let's see here.  350 by
40, right?

**A:     Right.**

Q:     You are saying that that is what? 8.60
An hour?

A:     Around there.

Q:     Okay.  8.60 an hour because you are
Dividing 350 by 40.

**A:     Into 40 hours, correct.  So then I guess
You divide your 8.60 into two, and that gives you
Half time.  Four-something an hour after your 40.**

Q:     So it's your testimony that while you
Were working for the company as a driver in the
Exact same position as Eugenio Garcia, that when
You worked in excess of 40 hours a week you would
Get paid half time?

**A:     After the 40 hours.**

Q:     Based on the regular rate of taking the
First 40 hours and dividing it into the salary?
MS. HERMES:  Objection.  He doesn't
Necessarily know what the regular rate is.

**A:     Exactly.**

PEREZ goes on to comment on his conversation with NICHOLS on Page 12, Line 1 thru

Page 13, Line 11:

**A:     The first day I went to apply for the job on Saturday.  I think it was n
December 2003.**

Q:     And you went to speak to Mr. Nichols?

**A:     Yes.**

Q:     And what did you discuss with him at that
Time?

A:     I discussed the position.

Q:     You mean the driver position?

**A:     Yes.  The driver position.  And the
Salary, that it was weekly.**

Q:     What did he tell you about when you
Worked in excess of 40 hours per week, how much you
Would be paid?

**A:     He told me I would get half-time.**

Q:      Based on your- -
A:      **On my salary.**
Q:      Did he tell you anything else besides
        That?
A:      **No.**
Q:      And your understanding was that you would
        Get half of 8.75 an hour- -
A:      **Correct.**
Q:      - - for all of the extra hours that you
        Worked above 40 weekly.
A:      **Correct.**
Q:      - - while you were a truck driver?
A:      **Correct.**
Q:      And that was the understanding that you
        Gained from Mr. - -
A:      **Nichols.**
Q:      Nichols.
A:      **Correct.**
Q:      You are absolutely sure of that, right?
A:      **Yes.**
Q:      And there's no doubt in your mind?
A:      **No doubt in my mind.**

CARDOVIE and PEREZ, each performed a similar job to that of the EUGENIO and each gave testimony regarding Defendant's explanation and their respective understanding of their compensation under the FWW. This testimony obviates the failure of the Defendant to properly implement the FWW and to properly compensate these employees under the FLSA. CARDOVIE and PEREZ' testimony, coupled with the following testimony of EUGENIO and NICHOLS, will make clear, or at least display a genuine issue of material fact, that the FWW method of payment was not properly implemented by the Defendant, and that EUGENIO, CARDOVIE, and PEREZ should have been compensated time-and-a-half instead of half time for hour work over forty.

Three additional genuine issues of material fact are present regarding whether a clear, mutual understanding existed between the employee and the employer that the employee will be paid a fixed salary regardless of the number of hours worked, and whether NICHOLS and Terrisita provided the Plaintiff with even a basic explanation of his compensation under the FWW method of payment. The deposition testimony and the Statement of Facts set forth below reveal these genuine issues of material fact for jury determination.

Defendants' Statement of Facts in Support of Their Motions for Summary Judgment #12 states, in part:

> *Nichols also explained to Plaintiff that he was 'going to get paid a salary of $350 and that the $350 was **'going to get paid a salary of $350 and that the $350 was going to cover the straight time for all hours worked...'*** (Exhibit D)

## DEFENDANT'S HAVE ALTERED A MATERIAL PORTION OF NICHOLS' TESTIMONY.  Footnote 3 to Defendants' Statement of Fact #12 states: (Exhibit E)

> *Of the corrected deposition transcript.  All cites to Nichols deposition, encompass corrections he made to the transcript* **[Nichols 6(20-23)**[3]

Defendants' Statement of Fact #12 is an attempt to **manipulate** the discovery to conform to the regulations.  NICHOLS' original deposition testimony on Page 6, Line 14-23, actually states: (Exhibit F)

Q:    There is a fluctuating work week agreement
in front of you premarked at exhibit 8.
A:    Right.
Q:    My question is, did you tell him anything in
Addition to what is written in that agreement when you
Give it to him?
A:    *I told him he was* **going to get paid a minimum Of $350 and that it was going to be based on a 40 hour Work week and anything over the 40 hours he would get Half-time.**

Richard Nichols original deposition testimony continues on Page 6(24)-8(2):

Q:    Okay.
A:    But during the summer weeks that he worked
Less than 40 hours he would still be paid a minimum of
350.  He was making at the time I believe $7.00 an hour.
so, in effect, in the slower time he was getting like
$7.00, it would be $280, he was now making $350.
Q:    And did you tell him anything else about the
Agreement other than that?
A:    No.
Q:    So if I understand correctly, when you gave
Him the fluctuating work week agreement you told him

---

[3] *Of the corrected deposition transcript.  All cites to Nichols deposition, encompass corrections he made to the transcript.*

| | | |
|---|---|---|
| | | That he would be getting a fixed salary of $350 a week. Correct? |
| A: | | Correct. |
| Q: | | For 40 hours of work, right? |
| A: | | **For 40 hours, correct.** |
| Q: | | And that he would be paid half-time for all of The hours that he worked above 40 hours a week? |
| A: | | **Correct.** |
| Q: | | And you told that to Mr. Garcia when you gave Him that agreement back in 2001 as marked on that Exhibit, right? |
| A: | | **Correct.** |
| Q: | | All right. Now, did you tell him anything Else besides that? |
| A: | | **No.** |
| Q: | | And you are sure of that, correct? |
| A: | | **To the best of my recollection, that is all I Remember talking about.** |

Based upon NICHOLS' original testimony and the Defendant's need to "correct" NICHOLS' original testimony, it is clear that NICHOLS told the Plaintiff at the time they discussed the Fluctuating Work Week method in November of 2001 that EUGENIO **"was going to get paid a minimum of $350 and that it was going to be based on a 40 hour work week and anything over the 40 hours he would get half-time."** NICHOLS understanding and what he told the Plaintiff is **INOPPOSITE** to the requirements of 29 C.F.R. § 77.114, that a clear, mutual understanding exist between the employee and the employer that the employee will be paid a fixed salary regardless of the number of hours worked. The deposition testimony of CARDOVIE and PEREZ, that they understood the salary to be compensation for a (40) forty-hour workweek, supports NICHOLS original deposition testimony.

EUGENIO'S deposition testimony concerning Terrisita's explanation of the Fixed Salary for Fluctuating Hours Agreement to the Plaintiff reads on Page 32, Line 6-25 thru Page 33, Line 7:

| | | |
|---|---|---|
| Q: | | Do you know someone by the name of Teresita That used to work for Port Royale? |
| A: | | Teresita, yes. Yes, yes. |
| Q: | | Did she ever help you complete paperwork? |
| **A:** | | **Yes.** |
| Q: | | Did she explain to you the paperwork that - - - |
| A: | | No, no. There is a problem there. When |

> They started this new law that all these people got—
> Got together to see how they exploit one, and she came
> To tell me- - she's a very nice person.  She's very
> Sweet.
> **She said to me, Tito, look, sign this paper**
> **Because this is for the raise that they're going to**
> **Give you.**
> **With this raise and the overtime is going**
> **To be great.  The overtime.  The overtime.**

Q:      Did she read the document to you?

**A:      No.  The only thing she told—she told**
**Me that this is because they're going to raise your**
**Salary.  They're going to raise your salary plus the**
**Overtime.  That's it.**

Q:      It was explained to you that you were going
To get a weekly salary?
MR. CAMPOS:        Form.

A:      Yes, yes, as always.  The
Same as always, but there was a raise coming.

NICHOLS' and Terrisita's explanation to EUGENIO regarding the Fixed Salary for Fluctuating Work Week Agreement, coupled with the fact that Terrisita filled out the Fluctuating Hours Agreement and failed to read the document to the Plaintiff, create a genuine issue of material fact regarding whether a clear, mutual understanding existed between the EUGENIO and PORT ROYALE.

There has been clear testimony from NICHOLS that he told EUGENIO that he **"was going to get paid a minimum of $350 and that it was going to be based on a 40 hour work week and anything over the 40 hours he would get half-time."**  It is conversely unclear from the EUGENIO'S deposition testimony what he understood, other than he was getting paid less than what he understood he would be paid based upon his conversations with NICHOLS and Terrisita.

CARDOVIE'S testimony corroborates that Terrisita communicated to him much the same information that NICHOLS and Terrisita communicated to the Plaintiff, EUGENIO.  David Cardovie's deposition reads at Page 12, Line 21 thru Page 14, Line 3:

Q:      Did Teresa tell you that for the $350 a
Week salary under the contract that you would only
Be required to work five days a week and never
Six days?
Ms. Hermes:   Objection.

**A:      Yes.**

Q:     Did she tell you that?

**A:     No.  She didn't tell me never we are**
**Going to work six days.  She only tell that you are**
**Going to work five days.  But she didn't tell us**
**You exactly will work five days.  You know?**

Q:     Right.  What did she tell you about five
Days when she gave you that new contract to sign?

**A:     That everybody will have a different day**
**To take a rest between Monday and Saturday.  Maybe**
**I rest Tuesday, but I work five days.  Different**
**Like another driver.  But during the week we should**
**Work five days under the contract signed.**

Q:     So Teresa told you that under this
Contract for $350 a week that you would be working
Five days a week?

**A:     Yes.**

Q:     Do you remember her telling you that?

**A:     Yes.**

Q:     All right.  When you were a driver at the
Company, did you always work more than 40 hours a
Week?

**A:     Yes.**

Q:     For every week that you worked as a
Driver?

**A:     Yes.**

Q:     Are you sure about that, right?

**A:     Yes.**

David Cardovie deposition continues on Page 23, Line 22- Page 24, Line 3:

Q:     Do you remember whether or not the actual
Contract that you signed, whether that discussed
The number of days you would be working?

**A:     No.  I didn't read that contract because**
**I won't understand what was in the paper.  But the**
**Secretary told us how the paper was to mean, You**
**Know.  You got me?**

David Cardovie's deposition testimony posits that he was told and his understanding was that the fixed salary was to cover "five days."   David Cardovie corroborates EUGEIO'S deposition testimony that the Fixed Salary for Fluctuating Hours Agreement was likely "explained" to EUGENIO by Terrisita in much the same fashion.

Defendant's cite **Griffin v. Wake County,** 142 F.3d 712, to support their contention that the Plaintiff's understanding can be inferred from the steps taken to inform the employee about the method of payment, including policies, procedures, and

payroll records.  See id. at 716-717.  In this case, NICHOLS did not take the basic steps to inform the Plaintiff, EUGENIO, of how his overtime would be calculated under the FWW.  NICHOLS deposition reads at Page 8, Line 11-25 thru Page 10, Line 20 as follows:

Q:      Okay.  Now, did you explain to Mr. Garcia
        When you told him that he would be getting half-time for
        The hours that he worked in excess of 40 hours per week
        Did you tell him how much that half-time would
        Constitute or be?
        Mr. Hermes:   Objection.  Answer.
**A:      No.**
Q:      You just told him that he would be getting
        Half-time and nothing else, correct?
**A:      I told him he would be getting half-time
        Instead of time and a half.**
Q:      All right.  When you told him that he was
        Getting half-time for the hours that he was working in
        Excess of 40 weekly, did you tell him that he would be
        Getting the same amount of half-time for all of his
        Hours that he worked in excess of 40 weekly?
        Ms. Hermes: Objection
Q:      Go ahead.
**A:      I didn't elaborate.**
Q:      And what was Mr. Martinez's- - I'm sorry, what
        Was Mr. Garcia's hourly rate before he switched over to
        The fluctuating work week method?
**A:      As I said just previously, I believe it was
        $7.00 per hour.**
Q:      And was it your understanding that he would be
        Paid three and a half dollars an hour for all hours
        He worked above 40 weekly on the fluctuating work week
        Method?
**A:      No, because there was the formula where the
        Hours are not set, it was not a set figure.**
Q:      But you didn't tell him that, right?
**A:      I told him it was going to be whatever the
        Formula, I told him there was a formula and whatever it
        Was, because each week it would be different, but I
        Didn't elaborate on any dollar amount, no.**
Q:      Did you tell him how the rate or that his
        Half-time would fluctuate depending on how many hours a
        Week he worked in excess of 40 weekly or did you not get
        Into those details?
**A:      I did not get into that.**

Q:     And you are sure about that, correct?
**A:     The best that I can remember, yes.**
Q:     Okay.  Now, and that would have applied to
       What you told all of the drivers back then, not just
       Mr. Garcia, right?
**A:     Correct.**
Q:     Okay.  Did you ever tell Mr. Garcia that his
       Hourly rate under the fluctuating work week method would
       Be determined by dividing the weekly salary by the first
       40 hours worked in that work week?
**A:     No.**
Q:     You didn't elaborate on anything like that,
       Right?
**A:     No.**
Q:     Okay.  And you are sure that you never gave
       Him any specifics as to how his hourly rate would be
       Determined?
**A:     Positive.**

If the Court agrees that the Defendant did not provide the Plaintiff with even a basic explanation of his compensation under the FWW, the issue of whether the Plaintiff was properly compensated under the Fair Labor Standards Act should be presented to the Jury.   The **Monahan** Court, in addition to placing the burden on the employer to demonstrate the existence of a clear mutual understanding when the employer attempt to utilize the fluctuating work week method of payment, goes on to note, and the Defendant will argue, that the existence of a clear mutual understanding under § 778.114 can be based on the implied terms of one's employment agreement if it is clear from the employee's actions that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise, supra at 1281.

A genuine issue of material fact exists regarding whether it was clear from EUGENIO'S actions that he understood the FWW method of payment plan implemented by the Defendant.  However, NICHOLS' deposition testimony, that he told EUGENIO that he **"was going to get paid a minimum of $350 and that it was going to be based on a 40 hour work week and anything over the 40 hours he would get half-time,"** coupled with NICHOLS' and Terrisita's failure to provide EUGENIO with even a basic understanding of how he would be paid under the FWW, preclude this argument prior to consideration.

The Court in **Roy v. County of Lexington**, 141 F.3d 533 (4th Cir. 1998), citing **Mayhew v. Wells,** 125 F.3d 216 (4th Cir. 1997), as their most recent discussion of the fluctuating workweek, upheld its application where the employee possessed only a basic understanding of his compensation plan: "he knew he would never be paid more than his fixed salary no matter how many hours he worked, nor would he be docked if he worked fewer than the expected 160 hours per work period."   Again, in this case, NICHOLS testified that the he told EUGENIO that he **"was going to get paid a minimum of $350 and that it was going to be based on a 40 hour work week and anything over the 40 hours he would get half-time,"** thus failing to provide EUGENIO with the even a basic understanding of his compensation.   There has been no testimony whatsoever from the Plaintiff that he understood the basics of the FWW or that he understood that he would be paid a fixed salary no matter how many hours he worked.  The only thing that EUGENIO clearly understood was that he was being paid less than he should based on his conversations with the Defendant.

In the case at bar, the Plaintiff never testified that he had any understanding while employed with the Defendant that he understood that the fixed salary was for all hours worked, and NICHOLS' testimony speaks to the contrary.  Additionally, the testimony is unequivocal that had EUGENIO complained that his compensation under the FWW was not what he had understood it to be based upon his conversations with NICHOLS and Terrisita, his employment would likely have been terminated.   NICHOLS testified on Page 4, Line 22-25:

> A:   We were changing over to a fluctuating work
>       Week and that was the option, and we let them know, and
>       If they wanted to stay, find, if not, if they wanted to
>       Leave that was fine, too.

David Cardovie testified, as well, on Page 9, Line 19-25 and Page 10, Line 1:

> A:   The secretary told us, do you want to
>       Work five days $350 per week, and the overtime- -
>       She told us, overtime half time.  But if you don't
>       Sign that paper, you could be fired because one
>       Driver, the female driver, didn't want to sign that
>       Paper.  She was fired for that reason.  In my case,
>       I didn't want to be fired, you know.  Everybody, we
>       Had to sign.

The Plaintiff, EUGENIO, testified on Page 62, Line 18-25 thru Page 63, Line 1-24:

Q:      So you understood then that they were
        Paying you the 350 plus half time for your overtime
        Hours?
A:      Everybody take---
        Mr. Campos: Form.
A:      The Witness: Let me explain. Let me
        Explain. I want to be clear. This girl---
Q:      Teresita?
**A:      Teresita told me, Tito. She was telling me
        You must be very happy now you are going to earn this
        Much, plus overtime. Plus the overtime. She didn't**
Q:      And after you had the conversation with
        Her and received your first pay check, did you see that
        The pay check was different from what you understood?
**A:      Yes.**
Q:      And did you talk about that with anyone?
**A:      No. No way.**
Q:      So after your checks kept coming showing
        The 350 plus the half time---
        Mr. Campos: Form.
**A:      The Witness: Here.**
Q:      --did you realize that was how Port Royale
        Was paying you?
**A:      That misery. That moment
        When I saw the first time, no. You don't have a
        Choice. But I didn't have a choice because I
        Have to work to live. And the same thing is
        Happening to everybody that's working there.**

## CONCLUSION

There exists a genuine issue of material fact concerning whether the Defendant communicated even the basics of the FWW to the Plaintiff, and whether EUGENIO understood even the basics of the FWW. It is reasonable to assume that the "regular lesson- - in the form of [his paycheck]" was not a regular lesson about how the fluctuating workweek plan operates, but was more likely a regular lesson in misunderstanding and frustration. In this case, there is sufficient evidence from the deposition testimony of EUGENIO, NICHOLS, CARDOVIE, and PEREZ to support the claimed factual dispute. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions. Genuine issues of material fact exist for jury determination in this case.

WHEREFORE, THE PLAINTIFF RESPONDS TO DEFENDANT, PORT ROYALE'S, MOTION FOR SUMMARY JUDGMENT AND REQUESTS THIS COURT DENY SAME FOR THE REASONS SET FORTH ABOVE.

Respectfully submitted:

J.H. Zidell, Esq.
J.H. Zidell, P.A.
F.B.N. 0010121
Attorneys for the Plaintiff
300 71st Street, Suite #605
Miami Beach, Florida 33141

_____
J.H. Zidell, Esquire

## CERTIFICATE OF SERVICE

John M. Hament, Esquire/Jennifer Fowler-Hermes, Esquire
Kunker, Miller, and Hament, P.A.
235 North Orange Avenue, Suite 200
Sarasota, FL 34236

I hereby certify that a true and correct copy of the foregoing was sent by mail and facsimile to the above named addressee(s) on this ___ day of November, 2005.

J.H. Zidell, Esq.
J.H. Zidell, P.A.
F.B.N. 0010121
Attorneys for the Plaintiffs
300 71st Street, Suite #605
Miami Beach, Florida 33141
Ph. (305)-865-6766

_____
J.H. Zidell, Esquire

19



*EX. 8*

Oasis Co. # _____
Client ID # _____

**OASIS**
**OUTSOURCING, INC.**
A Wisconsin Company

# Fixed Salary
# for Fluctuating Hours Agreement

I, *EUGENIO GARCIA* enter into this agreement with *Port Royale Trading*
(Print Name)                                                (Company Name)

this _____28_____ day of _____November_____, 20 _01_ as follows:
        (day)                              (month)

1. I agree to a fixed salary of $ _____950.00_____ per week, regardless of the number of hours worked each week.

2. I understand that the hours of work fluctuate from week to week, but I will be compensated at the amount stated above for whatever hours actually worked in a given week. My hourly rate will vary from week to week and is computed by dividing the number of hours actually worked in a workweek by the agreed upon weekly salary.

3. I acknowledge that the overtime rate is calculated at one-half times the regular hourly rate. This rate will be paid for all hours worked in excess of forty (40).

4. I further acknowledge that this salary agreement does not constitute an employment agreement and my employment is "at will" in accordance with the provisions stated in the employment manual.

Employee's Signature: X _Eugenio Garcia_ | Date: 11/27/01.

Employee's Social Security #: _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._

A

4/98

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO.  04-22640


EUGENIO GARCIA,

          Plaintiff,

vs.

PORT ROYALE TRADING CO., INC.,
LOUISE LYNCH, OASIS OUTSOURCING, INC.,

_____Defendants._____/



ORIGINAL


                    One Southeast Third Avenue
                    Suite 1250
                    Miami, Florida,
                    Thursday, 10:30 a.m.
                    March 24, 2005



          D E P O S I T I O N

          — — — — — — — —

               OF

               —

          EUGENIO GARCIA

          _____  _____


     Taken on behalf of the Defendants, pursuant to
a Notice of Taking Deposition.

          — — — — —


     KLEIN, BURY, REIF, APPLEBAUM and ASSOCIATES

                    β

A.    It was always per hour.

**Q.    At some time did that change?**

A.    No.  No.  This crap here that I don't understand.  I don't understand it or anybody understands it.

**Q.    Do you know someone by the name of Teresita that used to work for Port Royale?**

A.    Teresita, yes.  Yes, yes.

**Q.    Did she ever help you complete paperwork?**

A.    Yes.

**Q.    Did she explain to you the paperwork that ---**

A.    No, no.  There is a problem there.  When they started this new law that all these people got -- got together to see how they exploit one, and she came to tell me -- she's a very nice person.  She's very sweet.

She said to me, Tito, look, sign this paper because this is for the raise that they're going to give you.

With this raise and the overtime is going to be great.  The overtime.  The overtime.

**Q.    Did she read the document to you?**

A.    No.  The only thing she told -- she told me, that this is because they're going to raise your

salary.  They're going to raise your salary plus the
overtime.  That's it.

Q.   **It was explained to you that you were going**
**to get a weekly salary?**

MR. CAMPOS:  Form.

THE WITNESS:  Yes, yes, as always.  The
same as always, but there was a raise coming.

MS. FOWLER-HERMES:  Let's mark this as
exhibit seven?

(Thereupon, the document referred to was
marked Defendant's Exhibit No. 7 for
Identification.)

BY MS. FOWLER-HERMES:

Q.   **Have you seen these documents before?**

A.   This is the first time.

Q.   **What about the second page?**

A.   No.

Q.   **That's not your signature at the bottom?**

A.   That's mine.  Yeah, that's mine.  These are
mine.  This is mine, but not this one.

Q.   **So someone else filled out everything, but**
**where you are suppose to sign?**

A.   I couldn't say that.  But this is not -- I
have never seen this paper.  I don't remember having
seen it.  That is my signature.

1          Q.     This was provided to your attorney --

2    provided to your attorney in January of this year.

3          A.     And who provided it to him?

4          Q.     I did.  Will you take out Exhibit Number 5.

5          A.     I don't have it with me.

6          MR. CAMPOS:  This is five.

7    BY MS. FOWLER-HERMES:

8          Q.     Let's go ahead and turn to the second page

9    of Composite Exhibit 5 which has 000043 at the bottom.

10   And it indicates that the net pay is 348, $348.65.

11   Just to make sure we are looking at the same document.

12          If you can now turn to the fourth page of

13   exhibit number 9 which the number in the corner -- the

14   number in the corner is 000114.

15          It says here that the check -- the check

16   date is 11-7-03 on -- we're looking at the second page

17   of Exhibit Number 5.

18          Then if you look at the Oasis documents,

19   you will see where it says pay date, 11-7-2003.

20          A.     Uh-huh.  Yes.  What happened?

21          Q.     Okay.  And on there it says that you had 40

22   regular hours on number nine.  And 12 and a half hours

23   of overtime.  And then it also gives a gross pay of

24   404.69.  And the net pay of 348.65.  You see that?

25          A.     What is this?  What does this have to do

with anything?

Q.   Well, if you take a look at your pay check it will say regular pay, 350.  And then it says half time.  Half time.

A.   That's what I can't swallow.

Q.   54.69.  54.69.

A.   It doesn't even say the hours that you work.  That's cheating.

MS. FOWLER-HERMES:  We're going to take a quick break because the interpreter needs to step out.

MR. CAMPOS:  Sure.

(Discussion held off the record.)

MS. FOWLER-HERMES:  Let's mark the next one as 10.

(Thereupon, the document referred to was marked Defendant's Exhibit No. 10 for Identification.)

BY MS. FOWLER-HERMES:

Q.   What I just handed you are payroll records from Oasis.  What I would like to do at this point, I'm going to pick a couple of dates before you signed number eight and after you signed number eight.  Number eight being this document.

Okay.  If you turn to the second page of

1   Q.   Okay.   If you take a look at the -- I say

2   look at this.   There are some dates that are after it.

3   I'm going to take a look at the first four lines.   Some

4   are all in the latter part.

5           THE INTERPRETER:   I'm sorry.   Some of the

6           dates are after or before?

7           MS. FOWLER-HERMES:   Some of the dates are

8           before actually.   First four lines.

9           Please note for the record we're going to

10          highlight the first four lines in yellow so that

11          it will be easier to see.

12   BY MS. FOWLER-HERMES:

13          Q.   Do you see that for these four weeks that

14   are now highlighted on your paper that the description

15   of the pay says salary and under amount paid it is 350

16   in all four rows?   And do you notice that under hours,

17   the second line says you only worked 32.75 hours?

18          A.   The same amount.

19          Q.   You are still paid the -- you are still

20   paid the same amount even though you worked under 40

21   hours that week?

22          A.   Yes, I understand that.   I understand that.

23   I understand that.   I understand all of that.

24          Q.   And that's different from before when you

25   looked at page 000289, when you were only paid for

1   the -- where you were only paid for the actual hours

2   that you worked?

3        A.   Uh-huh.  Yes. Yes.  But I don't understand

4   it.  This is too much.

5          MS. FOWLER-HERMES:  Off the record.

6          (Discussion held off the record.)

7   BY MS. FOWLER-HERMES:

8        Q.   Mr. Garcia, what position did you hold

9   while you were employed with Port Royale?

10       A.   Driver the whole time.

11       Q.   And who was your supervisor?

12       A.   Richey.  And there were more supervisors

13   than employee.  Richey Martinez.  And the other one we

14   used to call him the red one.  Colorado.

15       Q.   And who set your hours?

16       A.   The office.  Everybody will punch in and

17   they will put it in -- they would put it in its place.

18       Q.   Who told you when to be at work?

19       A.   Richey.

20       Q.   Who does Rich work for?

21       A.   Richey is the owner.

22       Q.   Owner of?

23       A.   Of the Fishery.

24       Q.   Of Port Royale?

25       A.   Yes.  Or at least that's what he appeared

1   BY MS. FOWLER-HERMES:

2       Q.   -- to pursue it?

3       A.   When they started with this monkey

4   business.  I told myself take it easy, because if not

5   I'm going to have a heart attack.  And I took it easy.

6   And until I couldn't take it anymore.

7       Q.   What monkey business are you referring to?

8            MR. CAMPOS:  Form.

9            THE WITNESS:  Doing this.  Paying you three

10           dollars and something for so many hours of work.

11  BY MS. FOWLER-HERMES:

12      Q.   So when did you first realize that you were

13  getting paid that?

14      A.   Long time ago.  Ever since the first time I

15  saw it.  But I couldn't leave because I'm an older

16  person.  People don't know me.  All the companies don't

17  know me.  Other employees ---

18      Q.   So you understood then that they were

19  paying you the 350 plus half time for your overtime

20  hours?

21      A.   Everybody take ---

22           MR. CAMPOS:  Form.

23           THE WITNESS:  Let me explain.  Let me

24           explain.  I want to be clear.  This girl ---

25  BY MS. FOWLER-HERMES:

**Klein, Bury, Reif, Applebaum & Associates**
**A U.S. Legal Support Company**

1      Q.    Teresita?

2      A.    Teresita told me, Tito.  She was telling me

3   you must be very happy now you are going to earn this

4   much, plus overtime.  Plus the overtime.  She didn't

5   explain.  She didn't say anything else more than that.

6      Q.    **And after you had that conversation with**

7   **her and received your first pay check, did you see that**

8   **the pay check was different from what you understood?**

9      A.    Yes.

10     Q.    **And did you talk about that with anyone?**

11     A.    No.  No way.

12     Q.    **So after your checks kept coming showing**

13  **the 350 plus the half time ---**

14           MR. CAMPOS:  Form.

15           THE WITNESS:  Here.

16  BY MS. FOWLER-HERMES:

17     Q.    **-- did you realize that was how Port Royale**

18  **was paying you?**

19           MR. CAMPOS:  Form.

20           THE WITNESS:  That misery.  That moment

21           when I saw the first time, no.  You don't have a

22           choice.  But I didn't have a choice because I

23           have to work to live.  And the same thing is

24           happening to everybody that's working there.

25  BY MS. FOWLER-HERMES:

**Klein, Bury, Reif, Applebaum & Associates**
**A U.S. Legal Support Company**

1
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2

EUGENIO GARCIA
3
                         PLAINTIFF(S),
4
                    -vs-
5
PORT ROYALE TRADING CO., INC.,
6  LOUISE LYNCH, OASIS OUTSOURCING, INC.,

7                        DEFENDANT(S).
   _____/
8

9

10 AT:        LAW OFFICES OF J.H. ZIDELL
              300 71st Street, Suite 605
11            Miami Beach, Florida
              Monday,  August 1, 2005
12            1:15 p.m.

13

14           DEPOSITION OF DAVID CORDOVI

15

16      Taken before Rochel Albert, CSR and Notary

17 Public in and for the State of Florida at Large,

18 pursuant to Notice of Taking Deposition filed in

19 the above cause.

20

21 ==========================================================

22

23 ROCHEL ALBERT, Certified Shorthand Reporter
   305-305-3333

24

25                       C

8

```
 1          Q.   What time were you supposed to start work

 2    each day and what time were you supposed to finish

 3    while you were a driver for the company?

 4          A.   The time in my case, I have to enter at

 5    9:00 in the morning until at night.

 6          Q.   Until what time in the afternoon or

 7    evening?

 8          A.   Depending.  6:00 in the afternoon, 7:00.

 9    Almost 8:00 in the night.  Depending, you know, the

10    amount of jobs.

11          Q.   How many days a week?

12          A.   Six days.

13          Q.   And how much were you paid by Port Royale

14    for the hours that you worked more than 40 hours

15    per week?

16          A.   The half time is $4.30, but if you do

17    more than maybe like Eugenio do, 20-something more,

18    it's less money, you know.  Not 4.30.  Maybe four

19    dollars, something, you know.  Depending.

20          Q.   Do you understand how Port Royale Trading

21    Company's overtime payment to the drivers is?  Do

22    you understand the system?

23          A.   No.  When we was working, when we were

24    working, we was earning seven dollars plus overtime

25    time half.  Seven dollars, overtime 10.30.  But
```

1    later, they did maybe a contract.  I don't know.  A

2    paper.  We have to sign.  They told us that we have

3    to work five days, you know.  That it was the

4    contract, five days.  If you want to work five

5    days, if you want to earn 350 per week, okay.  Five

6    days is good.

7           But after that when we sign, sometimes in

8    the evening, yes, we were working five days, but

9    then we were short of driver, we work six days.

10   When somebody take a vacation, we work six days,

11   you know.  In the year, I can count maybe three or

12   four where they gave us five days of work every

13   week, depending.  But if we were short a driver, we

14   worked six days.

15        Q.   Let me ask you this.  When the company,

16   Port Royale, gave you this contract to sign for the

17   $350 a week, what did you understand that to be?

18   What was that for?

19        A.   The secretary told us, do you want to

20   work five days $350 per week, and the overtime --

21   she told us, overtime half time.  But if you don't

22   sign that paper, you could be fired because one

23   driver, the female driver, didn't want to sign that

24   paper.  She was fired for that reason.  In my case,

25   I didn't want to be fired, you know.  Everybody, we

1   had to sign.

2        Q.   Let me ask you this question.  Were you

3   given this contract for the $350 a week at the same

4   time that Eugenio Garcia was given the contract?

5        A.   Yes.  Maybe not the same day like mine.

6   It was before or after.  I am not sure now.

7        Q.   Okay.

8        A.   But at the same time we were getting to

9   the company, we had to sign the contract.

10        Q.   So who was the secretary at the company

11   that gave you this contract for $350 a week to be a

12   driver there?

13        A.   That secretary, her name is Teresa.

14        Q.   Teresa?

15        A.   I don't know the last name.

16        Q.   Okay.  And just tell me exactly what

17   Teresa told you when she gave you that contract for

18   the $350 a week.  What did she tell you?

19        A.   She told me, you have to sign this.  It's

20   a new contract.  You are going to earn $350 per

21   week.  You are going to work five days, and the pay

22   is going to be $8.75.

23        Q.   An hour?

24        A.   Yes.  Okay.  I told her okay.  It's not

25   bad.  But she told me in that case, but the

1    overtime -- the bad is the overtime is half time.

2    What could I do?  You have to sign this.  In the

3    first time they was paying less than the amount.

4    But we didn't sign that, you know.  But in the

5    meantime, we were obligated.  I don't know how to

6    say in English.  We had to do.  If you don't do,

7    you are fired.

8         Q.   Let me ask you this.  When Teresa from

9    the company told you that you would get paid half

10   time for your overtime hours under this system,

11   what did you understand that to mean?  What did

12   that mean to you?

13        A.   That the overtime -- one hour overtime is

14   going to be $4.35, because it's the half money of

15   the eight dollar per hour and 75 cents.

16        Q.   Did Teresa tell you that when you work

17   more overtime hours, then you get less half time?

18        A.   No.

19        Q.   Did you understand the contract that was

20   given to you by the company for the $350 a week to

21   mean that the more overtime --

22             **MS. HERMES:**  Objection.

23        Q.   -- that you worked, that the less half

24   time you would get for more overtime hours worked?

25        A.   In that case, she didn't tell us, because

 1    in that moment it was new, you know, it was new

 2    idea.  For us, it was strange because we never were

 3    like that because the overtime always is one time

 4    and a half.

 5         Q.    Okay.

 6         A.    But in that case, we have family.  We

 7    have to decide fire or to continue.

 8         Q.    Yes.  Let me ask you this.  Did you

 9    understand that under this $350 a week that was in

10    that contract that the company gave you, did you

11    understand that you would be getting $4.35 per hour

12    for all of the overtime hours that you worked, no

13    matter how many?

14         A.    Uh-huh.

15         Q.    Yes?

16         A.    We understand that.  But how she told us,

17    we are going to work five days, okay.  Because five

18    days, maybe we work less because we rush the job.

19    It's okay.  But work no more than five days,

20    because you know, it's more job.

21         Q.    Did Teresa tell you that for the $350 a

22    week salary under that contract that you would only

23    be required to work five days a week and never work

24    six days?

25              **MS. HERMES:**  Objection.

1     A.    Yes.

2     Q.    Did she tell you that?

3     A.    No.   She didn't tell me never we are

4   going to work six days.   She only tell that you are

5   going to work five days.   But she didn't tell us

6   you exactly will work five days.   You know?

7     Q.    Right.   What did she tell you about five

8   days when she gave you that new contract to sign?

9     A.    That everybody will have a different day

10  to take a rest between Monday and Saturday.   Maybe

11  I rest Tuesday, but I work five days.   Different

12  like another driver.   But during the week we should

13  work five days under the contract signed.

14    Q.    So Teresa told you that under this

15  contract for $350 a week that you would be working

16  five days a week?

17    A.    Yes.

18    Q.    Do you remember her telling you that?

19    A.    Yes.

20    Q.    All right.   When you were a driver at the

21  company, did you always work more than 40 hours a

22  week?

23    A.    Yes.

24    Q.    For every week that you worked as a

25  driver?

1        A.    Yes.

2        Q.    And you are sure about that, right?

3        A.    Yes.

4              **MS. HERMES:**  Did he respond?  I didn't

5        hear a response.

6              **MR. ZIDELL:**  He said "yes."

7        Q.    For all of your overtime hours that you

8   worked, meaning the hours more than 40 per week,

9   did the company always pay you at least $4.35 an

10  hour for those hours?

11       A.    Yes.  Because in my case I was doing 10,

12  12, depending.  Not like Eugenio was doing more

13  like that.  In his case, I saw that was not $4.35

14  for all the overtime.  In that case, it was less.

15  But in my case, like 10 hours more, I saw that they

16  was paying me 4.35, you know, but in Eugenio's case

17  it was different.

18       Q.    But in your case, you always received

19  $4.35 an hour for all the overtime that you worked?

20       A.    Yes.

21       Q.    No matter how many hours of overtime per

22  week that was?

23       A.    No.  Because how I told you, always I was

24  doing ten hours, because my route is not far away

25  like him, because he was working to Naples or

23

```
 1              A.    The receipt part of the check says the

 2    time was appear 350, and it says half time.

 3              Q.    Okay.

 4              A.    It doesn't say the time you worked, but

 5    it says the amount you are earning.

 6              Q.    Okay.  How often did you receive those?

 7              A.    How often?

 8              Q.    Yes.

 9              A.    The paper?

10              Q.    Yes.

11              A.    Every time.

12              Q.    Was that once a week?

13              A.    Once a week, weekly.

14              Q.    Are you currently working?

15              A.    At this moment?

16              Q.    Yes.

17              A.    Yes.

18              Q.    Where are you working?

19              A.    I am working at this moment at Ft. Pierce

20    for the company -- let me see.  I'm new over there.

21    Value Ombudsman.

22              Q.    Do you remember whether or not the actual

23    contract that you signed, whether that discussed

24    the number of days you would be working?

25              A.    No.  I didn't read that contract because
```

24

1  I won't understand what was in the paper.  But the

2  secretary told us how the paper was to mean.  You

3  know.  You got me?

4      Q.  Uh-huh.  Once you started working after

5  that change --

6      A.  I remember I had less than one year of

7  working.  I am not sure, you know.

8      Q.  Uh-huh.

9      A.  I'm not sure.

10     Q.  When you temporarily left your employment

11 at Port Royale, where did you go work?

12     A.  Galloway Towing Company.

13     Q.  Why did you come back?

14     A.  Because that company wasn't paying me the

15 money that a friend told me that I was supposed to

16 earn.  At that moment, I didn't have another job to

17 get.

18     Q.  So you weren't earning enough?

19     A.  No.  In the towing company?

20     Q.  Yes, at the towing company.

21     A.  It was paying me by percent, not per

22 hour.

23     Q.  Percent?

24     A.  Yes.  Twenty percent of the job I do,

25 including costs, something like that.

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2

3    EUGENIO GARCIA

                        PLAINTIFF(S),
4

                        -vs-
5

     PORT ROYAL TRADING CO., INC.,
6    LOUISE LYNCH, OASIS OUTSOURCING, INC.,

7                        DEFENDANT(S).
     ------------------------------------------/
8

9

     AT:        LAW OFFICES OF J.H. ZIDELL
10              300 71st Street, Suite 605
                Miami Beach, Florida
11              Monday, July 18, 2005
                10:15 a.m.
12

13

              DEPOSITION OF JUAN PEREZ
14

15         Taken before Rochel Albert, CSR and

16   Notary Public in and for the State of Florida at

17   Large, pursuant to Notice of Taking Deposition

18   filed in the above cause.

19

20

21

22
     =========================================================
23

24   ROCHEL ALBERT, Certified Shorthand Reporter

25   305-305-3333

1    A.    Like I told you, 350 based on 40 hours,

2  but if you do 30 hours or 25 or 32, you will get

3  your 350 based on 40.  If I will go over 40, it

4  will be half time.  Anything after 40 hours will be

5  a half time pay.  Below 40 hours, how many hours

6  you did, you will get your 350 or whatever was your

7  salary base, your salary.

8    Q.    Over 40 hours --

9    A.    Will be a half time pay.

10    Q.    So explain to me, if you would -- let's

11  take a workweek -- if you need a calculator, I can

12  get it for you.

13    A.    Sure.

14    Q.    Let's take a workweek that you actually

15  worked the 45 hours that you testified to earlier.

16  Okay?  Do you follow?

17    A.    Yes.

18    Q.    You were getting paid 350 for that

19  particular week, right?

20    A.    Correct.

21    Q.    How much would you get paid for those

22  extra five hours?

23    A.    Those hours, it would be half time pay.

24    Q.    Half time of what?

25    A.    If you divide 350 into 40, you come out

1    to like 8.65 an hour, right?

2         Q.   Hold on.  Let's see here.  350 divided by

3    40, right?

4         A.   Right.

5         Q.   You are saying that that is what?  8.60

6    an hour?

7         A.   Around there.

8         Q.   Okay.  8.60 an hour because you are

9    dividing 350 by 40?

10        A.   Into 40 hours, correct.  So then I guess

11   you divide your 8.60 into two, and that gives you

12   half time.  Four-something an hour after your 40.

13        Q.   So it's your testimony that while you

14   were working for the company as a driver in the

15   exact same position as Eugenio Garcia, that when

16   you worked in excess of 40 hours a week you would

17   get paid half time?

18        A.   After the 40 hours.

19        Q.   Based on a regular rate of taking the

20   first 40 hours and dividing it into the salary?

21        **MS. HERMES:**  Objection.  He doesn't

22        necessarily know what the regular rate is.

23        A.   Exactly.

24        **MR. ZIDELL:**  Counsel, you are not

25        supposed to be making those kind of coaching

1          A.     The first day I went to apply for the job

2     on a Saturday.   I think it was on December 2003.

3          Q.     And you went to speak to Mr. Nichols?

4          A.     Yes.

5          Q.     What did you discuss with him at that

6     time?

7          A.     I discussed the position.

8          Q.     You mean the driver position?

9          A.     Yes.   The driver position.   And the

10    salary, that it was weekly.

11         Q.     What did he tell you about when you

12    worked in excess of 40 hours per week, how much you

13    would be paid?

14         A.     He told me I would get half time.

15         Q.     Based on your --

16         A.     On my salary.

17         Q.     Did he tell you anything else besides

18    that?

19         A.     No.

20         Q.     And your understanding was that you would

21    get half of 8.75 an hour --

22         A.     Correct.

23         Q.     -- for all of the extra hours that you

24    worked above 40 weekly --

25         A.     Correct.

1    Q.    -- while you were a truck driver?

2    A.    Correct.

3    Q.    And that was the understanding that you

4    gained from Mr. --

5    A.    Nichols.

6    Q.    Nichols.

7    A.    Correct.

8    Q.    You are absolutely sure of that, right?

9    A.    Yes.

10   Q.    And there's no doubt in your mind?

11   A.    No doubt in my mind.

12   **MR. ZIDELL:**  I don't have anything

13   further of the witness.

14   **MS. HERMES:**  I have a couple of quick,

15   quick questions.

16                      EXAMINATION

17   **BY MS. HERMES:**

18   Q.    In terms of the hours that you worked,

19   does that vary?

20   A.    Hours weekly?

21   Q.    Yes.

22   A.    Yes, it varies.

23   Q.    Are you referring to when he was a

24   manager or a truck driver?

25           **MS. HERMES:**  Truck driver.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**EUGENIO GARCIA,**

      **Plaintiff,**

vs.                                              **CASE NO. 04-22640 CIV-JORDAN**

**PORT ROYALE TRADING CO., INC.,**
**LOUISE LYNCH, and OASIS**
**OUTSOURCING, INC.,**

      **Defendants.**

_____/

## DEFENDANTS' STATEMENT OF FACTS
## IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

Defendants, Port Royale Trading Co., Inc., Louise Lynch, and Oasis Outsourcing, Inc., by and through their undersigned attorneys, and pursuant to Rule 56(b), Fed.R.Civ.P., and Rule 7.5(c) of the Local Rules for the United States District Court for the Southern District of Florida, hereby submit their Statement of Facts in Support of their Motions for Summary Judgment.

1.      Defendant Port Royale Trading Company ("Port Royale") distributes seafood to restaurants throughout the State of Florida. [Nichols: 13(22-24), 19(15-16)] [Garcia: 48(18-20)]. Richard Nichols ("Nichols"), one of the corporate owners, runs the day-to-day operations of Port Royale. He is in charge of the sales staff, the warehouse staff and the truck drivers. [Lynch: 7(9-13)].

2.      Louise Lynch ("Lynch") is Port Royale' corporate secretary. [Lynch: 4(3-7)]. Lynch runs the inside office and oversees receivables. [Lynch: 5(5-15)]. Every week, Lynch reports the hours each employee works to the company that handles Port Royale's payroll processing. [Lynch: 7(13-23)]. Although she does not determine how much employees are to be paid, Lynch is also responsible for making sure that all employees receive a paycheck. [Lynch: 14(1-13)].



them a salary. *See Id.* Oasis contacted a wage and hour expert, Travis Campbell,[2] to discuss the legality of changing the truck drivers' compensation. [McAllister: 19(15)-21(12)]. After this consultation, Port Royale made the decision to pay its truck drivers pursuant to the FWW method of compensation. [Nichols: 4(13-16)].

    12.     Nichols gave Plaintiff the Fixed Salary for Fluctuating Hours Agreement ("Agreement"), and Plaintiff turned the Agreement into the accounting department. [Nichols: 6(6-9)]. Nichols also explained to Plaintiff that he was "going to get paid a salary of $350 and that the $350 was going to cover the straight time for all hours worked..." [Nichols: 6(20-23)][3]. He also informed Plaintiff that the $350 was a minimum salary:

> worked less than 40 hours he would still be paid a minimum of $350. He was making at the time I believe $7.00 an hour, so, in effect, in the slower time he was getting like $7.00, it would be $280, he was now making 350.

[Nichols:6(25)-7(4)]. Nichols' assistant, Terrisita, also explained to Plaintiff that he was going to receive a set salary plus overtime. [Garcia: 62(18)-63(5)].

    13.     On November 27, 2001, Plaintiff executed the Agreement,[4] wherein he agreed to

---

[2] Campbell is the former head of the Division of Wage and Hour of the Federal Department of Labor in Baltimore, Maryland. [McAllister: 19(25)-20(2)]. His resume is attached to McAllister's Affidavit. [McAllister Aff: Ex. 2].

[3] Of the corrected deposition transcript. All cites to Nichols deposition, encompass any corrections he made to the transcript.

[4] Plaintiff asserts that he did not understand the document because it was in English. Plaintiff's claim that he could not understand English is contradicted by his testimony that he believes he is entitled to time and one-half based on "what I read in the Miami Herald." [Garcia: 71(6-7)]. The Miami Herald is an English language newspaper. The Spanish newspaper published by the same company as the Miami Herald is called the El Nuevo Herald. *See* http://subscriptions.herald.com. Further, during his deposition, Plaintiff's counsel had to stop the deposition to direct his client not to respond to the questions in English, but to wait for the interpreter to translate the questions to Spanish before answering. [Garcia: 5(6-12)]. Even if we

-5-

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2
                    CASE NO. 04-22640-CIV-JORDAN
3

4    EUGENIO GARCIA,

5                    Plaintiff,

6    vs.

7    PORT ROYALE TRADING CO., INC.,
     LOUISE LYNCH and OASIS
8    OUTSOURCING, INC.,

9                    Defendants.

10   _____ /

11

12        DEPOSITION OF RICHARD NICHOLS

13

          Taken before NANCY SIEGEL,
14
     Registered Merit Reporter and Notary Public
15
     in and for the State of Florida at Large,
16
     pursuant to Notice of Taking Deposition
17
     filed by the Plaintiff in the above cause.
18

19                    - - -

20

21

22                  **F**

23
     Friday, April 8, 2005
24   300 71st Street, Suite 605
     Miami, Florida
25   1:20 p.m. - 1:50 p.m.


          OFFICIAL REPORTING SERVICE   (954) 467-8204

```
 1      A     Correct.

 2      Q     Along with Ms. Lynch?

 3      A     Correct.

 4      Q     And two others?

 5      A     Correct.

 6      Q     Now, tell me, you knew Eugenio Garcia while he

 7   worked there?

 8      A     Yes.

 9      Q     What did he do?

10      A     He was a truck driver.

11      Q     Was he always a truck driver?

12      A     Yes.

13      Q     And were you there when you -- did you change

14   over all of the truck drivers to the fluctuating work

15   week method at one time?

16      A     Yes.

17      Q     Did you give them a choice whether they could

18   reject that method if they wanted to and still work for

19   the company or did you say that they must sign the paper

20   for fluctuating work week if they wanted to continue to

21   work for the company?

22      A     We were changing over to a fluctuating work

23   week and that was the option, and we let them know, and

24   if they wanted to stay, fine, if not, if they wanted to

25   leave that was fine, too
```

OFFICIAL REPORTING SERVICE  (954) 467-8204

1      Q      Okay.  Now, tell me this, did Mr. Garcia speak

2   English?

3      A      Yes.

4      Q      Fluently?

5      A      I did not have a problem understanding him.

6      Q      And did you give him this fluctuating work

7   week agreement to sign?

8      A      I gave it to him and he turned it into the

9   accounting department.

10      Q      What did you tell him when you gave him this

11   agreement?  We will keep it marked as exhibit 8 as it

12   was in his deposition, go ahead.

13      A      I don't understand the question, say it again.

14      Q      There is the fluctuating work week agreement

15   in front of you premarked as exhibit 8.

16      A      Right.

17      Q      My question is, did you tell him anything in

18   addition to what is written in that agreement when you

19   gave it to him?

20      A      I told him he was going to get paid a minimum

21   of $350 and that it was going to be based on a 40 hour

22   work week and anything over the 40 hours he would get

23   half-time.

24      Q      Okay.

25      A      But during the summer our weeks that he worked

OFFICIAL REPORTING SERVICE  (954) 467-8204

7

1    less than 40 hours he would still be paid a minimum of

2    350.  He was making at the time I believe $7.00 an hour,

3    so, in effect, in the slower time he was getting like

4    $7.00, it would be $280, he was now making 350.

5        Q    And did you tell him anything else about the

6    agreement other than that?

7        A    No.

8        Q    So if I understand correctly, when you gave

9    him the fluctuating work week agreement you told him

10   that he would be getting a fixed salary of $350 a week,

11   correct?

12       A    Correct.

13       Q    For 40 hours of work, right?

14       A    For 40 hours, correct.

15       Q    And that he would be paid half-time for all of

16   the hours that he worked above 40 hours a week?

17       A    Correct.

18       Q    And you told that to Mr. Garcia when you gave

19   him that agreement back in 2001 as marked on that

20   exhibit, right?

21       A    Correct.

22       Q    All right.  Now, did you tell him anything

23   else besides that?

24       A    No.

25       Q    And you are sure of that, correct?

OFFICIAL REPORTING SERVICE  (954) 467-8204

8

```
 1        A     To the best of my recollection, that is all
 2   remember talking about.
 3        Q     Okay.  Now, and you told that to all of the
 4   other truck drivers as well, right?
 5        A     Correct.
 6        Q     How many truck drivers did you have at that
 7   time that switched over to this fluctuating work week
 8   method?
 9        A     Whatever we had, which is a guess, I think
10   was either seven or eight.
11        Q     Okay.  Now, did you explain to Mr. Garcia
12   when you told him that he would be getting half-time
13   the hours that he worked in excess of 40 hours per
14   did you tell him how much that half-time would
15   constitute or be?
16              MS. HERMES:  Objection.  Answer.
17              THE WITNESS:  No.
18   BY MR. ZIDELL:
19        Q     You just told him that he would be gett'
20   half-time and nothing else, correct?
21        A     I told him he would be getting half-tir
22   instead of time and a half.
23        Q     All right.  When you told him that he
24   getting half-time for the hours that he was worl
25   excess of 40 weekly, did you tell him that he w
```

```
 1    getting the same amount of half-time for all of his
 2    hours that he worked in excess of 40 weekly?
 3              MS. HERMES:  Objection.
 4    BY MR. ZIDELL:
 5        Q    Go ahead.
 6        A    I didn't elaborate.
 7        Q    And what was Mr. Martinez's -- I'm sorry, what
 8    was Mr. Garcia's hourly rate before he switched over to
 9    the fluctuating work week method?
10        A    As I said just previously, I believe it was
11    $7.00 an hour.
12        Q    And was it your understanding that he would be
13    paid three and a half dollars an hour for all the hours
14    he worked above 40 weekly on the fluctuating work week
15    method?
16        A    No, because there was the formula where the
17    hours are not set, it was not a set figure.
18        Q    But you didn't tell him that, right?
19        A    I told him it is going to be whatever the
20    formula, I told him there is a formula and whatever it
21    was, because each week it would be different, but I
22    didn't elaborate on any dollar amount, no.
23        Q    Did you tell him how the rate or that his
24    half-time would fluctuate depending on how many hours a
25    week he worked in excess of 40 weekly or did you not get
```

OFFICIAL REPORTING SERVICE  (954) 467-8204

1    into those details?

2         A    I did not get into that.

3         Q    And you are sure about that, correct?

4         A    The best that I can remember, yes.

5         Q    Okay.  Now, and that would have applied to

6    what you told all of the drivers back then, not just

7    Mr. Garcia, right?

8         A    Correct.

9         Q    Okay.  Did you ever tell Mr. Garcia that his

10   hourly rate under the fluctuating work week method would

11   be determined by dividing the weekly salary by the first

12   40 hours worked in that work week?

13        A    No.

14        Q    You didn't elaborate on anything like that,

15   right?

16        A    No.

17        Q    Okay.  And you are sure that you never gave

18   him any specifics as to how his hourly rate would be

19   determined?

20        A    Positive.

21        Q    Okay.  Why didn't you include some type of an

22   example in this November 27th, 2001 fluctuating work

23   week agreement so that the employee could actually see

24   how it would have worked in reality?

25        A    I was informed that Oasis provided us with and