

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 04-22640 CIV-JORDAN

EUGENIO GARCIA,

      Plaintiff,

v.

PORT ROYALE TRADING CO., INC.,
LOUISE LYNCH, and OASIS
OUTSOURCING, INC.,

      Defendants.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT, OASIS OUTSOURCING, INC.'S, MOTION FOR SUMMARY JUDGMENT

OME NOW the Plaintiff, by and through undersigned counsel and states the following:

1. Defendant, OASIS OUTSOURCING, INC., ("OASIS") filed their Motion for Summary Judgment and Incorporated Memorandum of Law, and Defendants' Statement of Facts in Support of their Motions for Summary Judgment on or about October 13, 2005.

2. OASIS has filed with the Court and relied upon the deposition testimony and affidavit of PAIGE MCALLISTER, ("MCALLISTER") to support the proposition that OASIS was not the employer or joint employer of Plaintiff, EUGENIO GARCIA, ("EUGENIO") under the Fair Labor Standards Act.

3. OASIS and PORT ROYALE TRADING CO., INC. ("PORT ROYALE"), entered into a Client Service Agreement (Exhibit A) whereby OASIS agreed to provide the following services to PORT ROYALE:

    ·    OASIS assumes responsibility for the payment of wages to the Assigned Employees without regard to payment by CLIENT to OASIS.

    ·    OASIS assumes full responsibility for the payment of payroll taxes and collection of taxes from payroll on Assigned Employees.

· OASIS assumes responsibility for the proper administration and payment of workers' compensation premium(s) and the employee benefit program, except in the event that applicable law requires the CLIENT to maintain said policies or programs or CLIENT elects to maintain said policies or programs.

· OASIS assumes responsibility for completion and maintenance of all payroll records, with the exception of the records of actual hours worked which shall be maintained and verified by CLIENT.

· OASIS may hire or appoint an on-site administrative coordinator to implement terms and conditions of this Agreement.

4. OASIS contends that the EUGENIO relied solely on PORT ROYALE and not on OASIS for his economic livelihood, and therefore is not an employer or joint employer under the Fair Labor Standards Act.

5. Plaintiff herein incorporates Plaintiff's Response to PORT ROYALE'S Motion for Summary Judgment as if fully set forth herein to demonstrate that the Plaintiff performed work for the Defendants for which he was not properly compensated.

6. Plaintiff will herein demonstrate that OASIS is an employer or joint employer under the Fair Labor Standards Act and is therefore liable for payment of Plaintiff's overtime wages under the Fair Labor Standards Act.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56c. An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. On a motion for summary judgment, the court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. While the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. A mere scintilla of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough.

2

## DEFENDANT'S ARGUMENTS

Defendant, OASIS, citing **Jeanneret v. Aron's East Coast Towing Inc.,** 2002 U.S. Dist. LEXIS 12200 (S. Dist. FL 2002), states as their first argument "that the provisions of state law that regulate the employment relationship are only relevant to the extent that the parties actually followed the requirements of the state law." OASIS goes on to reason, under the auspice of the **Jeanneret** Court, that "as a consequence, any state law or contractual agreement between parties that dictates a joint employer relationship are not applicable to a determination of whether or not a joint employment relationship exists under the FLSA." OASIS' reasoning is flawed in the sense that the contractual agreement between OASIS and PORT ROYALE, Client Service Agreement, (Exhibit A) is applicable and relevant to the determination of a employer or joint employment relationship to the extent that the Defendants acted in accordance with the agreement and exhibited the actions and controls necessary to qualify as an employer or joint employer under the Fair Labor Standards Act.

## PLAINTIFF'S ARGUMENTS

The issue of joint employment liability is addressed in 29 § 825.106, which provides in part, that single employer status may attach to separate employers where an employer exercises some kind of substantial control over the work of the other employer's employee. Section 825.106(a) sets forth the three situations where separate employers may constitute a joint employer of an employee. This regulation provides as follows:

Where the employee performs work which simultaneously benefits two or more employers...a joint employment relationship generally will be considered to exist in situations such as:

1)   Where there is an arrangement between employers to share an employee's services or to interchange employees; or

2)   Where on employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

3)   Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by or is under common control with the other employer.

The Eleventh Circuit has identified criteria from Supreme Court and circuit court case law interpreting the definition of "joint employer" under various federal labor statutes. *See Antenor, 88 F.3d at 932; Aimable, 20 F.3d at 440-446; Jeanneret, 2002 U.S. Dist Lexis 12200.* According to *Jeanerette:*

In determining whether a joint employment relationship exists, the courts consider several relevant factors:

1) the nature and degree of the putative employer's control of the workers;
2) the degree of supervision, direct or indirect, of the work;
3) the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions;
4) the power to determine the workers' pay rates or methods of payment;
5) the preparation of payroll and payment of workers' wages;
6) the ownership of the facilities where the work occurred;
7) whether the workers performed a line job integral to the end product; and
8) the relative investment in equipment and facilities.

*2002 U.S. Dist. LEXIS at 7-8 (citing Antenor, 88 F.3d at 932; Aimable, 20 F.3d at 440-45; Santelicies v. Cable Wiring, 147 F. Supp. 2d 1313, 1326 [1256] (S.D. Fla. 2001.)*

The Court in *Jeanneret* also indicated that this analysis should be guided by the following principles enumerated by the Eleventh Circuit in *Antenor:*

· First, the question of "joint employment" is not dependant on whether the worker is more economically dependant on one putative employer than on the other, because more than one entity can be an employer.

· Second, the existence of a joint employment relationship depends on the economic reality of all the circumstances, rather than any one factor.

· Third, the factors are used because they are indicators of economic dependence.

· Fourth, the joint employment relationship is not determinative by a mathematical formula- the court must view each of the factors qualitatively to assess the evidence of economic dependence.

· Fifth, the inquiry must focus on the issue of economic dependency, not common-law concepts of employment.

· Sixth, the Statutes are remedial, and the courts must construe it broadly.

*2002 U.S. Dist. LEXIS 12200 at 8 (citing Antenor, 88 F.3d at 932-33) citing* **Cruz-Lovo v. Ryder System, Inc. et. al.,** 298 F. Supp. 2d 1248 (11th Cir. 2003)

## Analysis

Like *Jeanneret, Antenor, and Cruz-Lovo,* the Court in this case should be guided by the above principles in analyzing this case. The facts of this case are similar to those of *Jeanneret* in that the Co-defendant in *Jeanneret,* Sunshine Companies II, Inc., and OASIS, claim to be subject to F.S. § 468.520. Whereas the legal conclusion reached by the *Jeanneret* Court may pertain to OASIS regarding F.S. § 468.520, the Court's decision is not dispositive due to the factual differences between the way Sunshine Company II, Inc. and OASIS acted in regards to their respective co-defendants, vis-à-vis the Plaintiffs. The Client Service Agreement between OASIS and PORT ROYALE should be considered persuasive to the extent the parties comported with it.

The case at bar also differs from *Jeanneret, Antenor, and Cruz-Lovo* in that these cases seek to determine whether a co-defendant is an employer or a joint employer for the purpose of determining whether unpaid overtime wages are due the Plaintiffs from each respective co-defendant and employer. The economic realities test in *Jeanneret, Antenor, and Cruz-Lovo* rightly examines the facts pursuant to the above factors and principles. In the case at bar, however, OASIS was directly responsible for determining the actual amount of overtime wages due to be paid the Plaintiff. Therefore, this case is different from *Jeanneret, Antenor, and Cruz-Lovo,* and this fact alone is qualitatively more important and relevant than any other. Because OASIS' actual role in the determination and implementation of Plaintiff's overtime wage is elemental to determining OASIS' disposition as an employer for the purposes of FLSA liability, a genuine issue of material fact exists as to whether OASIS is an employer and liable for unpaid wages.

Plainly, OASIS was directly responsible for correctly modifying the Plaintiff's employment condition, i.e. altering his overtime pay from time-and-a-half to half-time, and correctly implementing the FWW on a weekly basis; OASIS was directly responsible for determining Plaintiff's pay rate, i.e. calculating his half-time overtime rate based on all hours worked or based on a forty hour work week; and, OASIS was directly responsible for the preparation of PORT ROYALE'S payroll and the payment of Plaintiff's wages. Plaintiff's economic livelihood and economic dependence upon OASIS could not be any more intimately intertwined than the determination, alteration, preparation, and payment of Plaintiff's compensation, independent of PORT ROAYLE.

## RIGHT TO HIRE, FIRE, OR MODIFY THE WORKERS' EMPLOYMENT CONDITIONS

In **Antenor v. D & S Farms,** 88 F.3d 925, 936 (C.A. 11th 1996), the evidence indicated that the growers had the power to "veto" Turke's hiring decisions and to modify employment conditions such as the hours the pickers worked. For example, the growers themselves monitored the workers' job qualifications rather than relying on Turke to do so when they stopped work until they could verify compliance with the new immigration laws.

In the case at bar, Defendant's Statement of Facts in Support of Their Motions for Summary Judgment #15 quotes the Affidavit of OASIS' Corporate Representative:

> Plaintiff's regular rate under the FWW was initially determined by dividing his salary by the total number of hours he worked each week. [McAllister Aff: ¶9]. Plaintiff's overtime rate was one-half his regular rate, and as his hours increased, his regular rate and overtime pay decreased.  For the paychecks issued from 12/7/01 to 6/21/02, this is how Plaintiff's half-time rate and overtime pay decreased.  For the paychecks issued from 12/7/01 to 6/21/02, this is how Plaintiff's half-time rate was calculated. *See id.*  In June of 2002, <u>Oasis changed its computer systems.</u>  When this change occurred, <u>Oasis' payroll program began calculating Plaintiff's half-time rate by dividing Plaintiff's salary by 40 instead of by all hours worked.  As a consequence, his half-time rate was greater than it would have been before the payroll system changed.</u>  For the remainder of his employment with Port Royale, this is how his overtime was calculated. [McAllister Aff: ¶ 10]

It is apparent based on Defendant's Statement of Facts #15 that OASIS modified the Plaintiff's employment conditions, both direct and indirectly, and that it had the power to so independent of the dictates of PORT ROYALE.  Clearly, when OASIS changed its computer system in June of 2002, OASIS began paying the Plaintiff half-time overtime based upon a 40 hour work week instead of based on the total number of hours worked.  <u>OASIS determined the actual amount of the Plaintiff's compensation each week because "PORT ROYALE only submits its employees' hours to OASIS."</u> [MCALLISTER Aff. ¶4]  In effect, OASIS took PORT ROYALE out of the loop.  PORT ROYALE'S inability to detect a change in the rate of pay to its drivers exacerbates the fact that the Plaintiff relied upon OASIS for his livelihood.  OASIS' ability to independently modify Plaintiff's pay creates a genuine issue of material fact regarding OASIS' status as an employer or joint employer of the Plaintiff.

## POWER TO DETERMINE PAY RATES OR METHODS OF PAYMENT

In Cruz, the Plaintiff pointed to the fact that Ryder provided human resource services to Credit Union and that Credit Union managers utilized Ryder's human resource department on an ad hoc basis. *Supra at 1257.* In Cruz, it was undisputed that Ms. Suarez, Plaintiff's direct supervisor, consulted with a representative of Ryder's human resource department prior to firing Plaintiff, and that the purpose of the meeting was to insure that Ms. Suarez, who was not trained in human resources, followed proper procedure. See Cruz at 1250 n2. The Cruz Court was unconvinced that Ryder exerted the requisite supervision because Plaintiff presented no evidence that any Ryder human resources representative exercised control over Plaintiff or any other Credit Union employee. See id. at 1257.

The case at bar differs from the above factual scenario in that PORT ROYALE consulted with OASIS concerning an intimate business function, i.e., how to pay specific employees, in effect, less. This consultation is outside the confines of OASIS administrative function and is not an "ad hoc" consultation as was the case in Cruz. Instead, this consultation, because it relates to payroll, was routine. Here, OASIS received a regular consultation concerning the FWW in the form of paychecks, payrolls, employee earnings recaps, and employee Payroll vouchers. While it is argued that it was PORT ROYALE'S "decision to begin paying its truck drivers pursuant to the FWW method of compensation," [MCALLISTER AFF. #7] it was OASIS who researched the FWW, implemented the FWW as a practical matter, and actually paid the Plaintiff every week pursuant to that method. MCALLISTER'S affidavit states at Paragraph 7:

> On June 18, 2001, Richard Nichols ("Nichols") contacted me on behalf of Port Royale, regarding the legality of changing the way he paid his truck drivers. Pursuant to Oasis policy, I completed the Contact Form to document the details of our conversation. This form is attached hereto as Exhibit 2 and incorporated by reference herein. Port Royale's business fluctuated seasonally and Nichols wanted to pay them a salary. After discussing his request with my supervisor, on June 20, 2001, she and I contacted Travis Campbell to discuss Nichols inquiry. Campbell serves as a wage and hour consultant for Oasis. He is the former head of the Division of Wage and Hour in Baltimore, Maryland. Campbell's resume is attached hereto as Exhibit 3 and incorporated by reference herein. After this consultation, we provided Port Royale with the requirements of the Fluctuating Work Week ("FWW") method of compensation. Port Royale then made the

decision to begin paying its truck drivers pursuant to the FWW method of compensation.

The steps taken by MCALLISTER, her supervisor, and Travis Campbell to research the FWW method far exceed an "ad hoc" consultation, especially when OASIS is the one that implemented the practice, and paid the truck drivers accordingly. Section 825.106(a) sets forth the three situations where separate employers may constitute a joint employer of an employee. In this instance, OASIS and PORT ROYALE are not completely disassociated with respect to the employee's employment. OASIS may be charged with sharing indirect control with PORT ROYALE over the Plaintiff, therefore a genuine issue of material fact exists for jury determination.

## PREPARATION OF PAYROLL AND PAYMENT OF WAGES

OASIS and PORT ROYALE entered into a Client Service Agreement whereby OASIS agreed to assume responsibility for the payment of wages to the Plaintiff without regard to payment by PORT ROYALE to OASIS. In **Aetenor**, where the determination of payroll and payment of wages was interrelated to the determination of pay rates, the Court found that the putative employer's involvement in the "preparation of payroll and the payment of wages" to the workers. 29 C.F.R. § 500.20(h)(4)(ii)(E), is probative of joint employment because of the likelihood that when a business undertakes to help an independent contractor prepare its payroll and pay its wages, it is likely that the contractor lacks economic substance on which the workers can solely depend. Supra at 937. In **Aetenor**, the growers' power to exercise some control over the workers' pay was evidenced by their deduction of money from their payments to Turke. First, rather than paying Turke the full $ 3.90 per box of beans harvested, they deducted 11 cents per box to purchase worker's compensation insurance, decided which insurance to buy, and named themselves as the policy holders. Thus, Turke did not solely and independently establish wage rates and other benefits for the workers. Indeed, Turke could not purchase insurance to cover the workers because he lacked the economic wherewithal; in his own words, "[he] didn't have the money to fork up for workman's comp right then and there." Thus, the farmworkers were dependent on the growers to obtain financial compensation for job-related injuries. See Fahs, 166 F.2d at 42 (finding dependence where employee covered by business' worker's compensation insurance.) See id at 937.

Respectfully submitted:

J.H. Zidell, Esq.
J.H. Zidell, P.A.
F.B.N. 0010121
Attorneys for the Plaintiff
300 71st Street, Suite #605
Miami Beach, Florida 33141


*Terrence L. Conover* FOR
J.H. Zidell, Esquire


## CERTIFICATE OF SERVICE

John M. Hament, Esquire/Jennifer Fowler-Hermes, Esquire
Kunker, Miller, and Hament, P.A.
235 North Orange Avenue, Suite 200
Sarasota, FL 34236

I hereby certify that a true and correct copy of the foregoing was sent by mail and facsimile to the above named addressee(s) on this _15_ day of November, 2005.

J.H. Zidell, P.A.
F.B.N. 0010121
300 71st Street, Suite #605
Miami Beach, Florida 33141
Ph. (305)-865-6766


*Terrence L. Conover* FOR
J.H. Zidell, Esquire

Oasis Co. # _____
Client ID # _____

# CLIENT SERVICE AGREEMENT

This AGREEMENT dated ___7 – 12___, ~~1992~~ 2000 is made between _PORT ROYALE TRADING Co, INC._
and its subsidiaries, (the individual or firm hereinafter referred to as "CLIENT" ) and OASIS OUTSOURCING, INC., a
Florida corporation (hereinafter referred to as "OASIS").

I.      TERM OF THIS AGREEMENT.

The term of this Agreement shall be from the COMMENCEMENT DATE as shown on Exhibit A attached
hereto until terminated by either party giving forty-five (45) days' written notice. After notice, the termination
is to occur at the end of the next calendar month or forty-five days from the date of notification, whichever is
later. Until the end of the next calendar month following such cancellation, the parties will continue to meet
the obligations set forth in this Agreement. In addition, OASIS may at any time immediately terminate this
Agreement in the event of a breach by CLIENT of any of the terms of this Agreement or upon the
occurrence of any of the events set forth In Section IV(H). below.

II.     PROFESSIONAL EMPLOYMENT SERVICES.

By entering Into this Agreement, OASIS has agreed to provide Professional Employment Services as stated
under III. DUTIES AND OBLIGATIONS OF OASIS to CLIENT. It is not the intention of this Agreement to
insulate CLIENT in any manner from those responsibilities which the law imposes upon it as a business or
workplace except as herein expressly assumed by OASIS. Nor is it the purpose of this Agreement for
OASIS to provide a pass-through payroll service.

III.    DUTIES & OBLIGATIONS OF OASIS.

A.  Services.  OASIS agrees to provide the following services to CLIENT:

1.  OASIS assumes responsibility for the payment of wages to the Assigned Employees without
regard to payments by CLIENT to OASIS.

2.  OASIS assumes full responsibility for the payment of payroll taxes and collection of taxes from
payroll on Assigned Employees.

3.  OASIS assumes responsibility for the proper administration and payment of workers'
compensation premium(s) and the employee benefit programs, except In the event that
applicable law requires the CLIENT to maintain said policies or programs or CLIENT elects to
maintain said policies or programs.

4.  OASIS assumes responsibility for completion and maintenance of all payroll and benefit
records, with the exception of the records of actual hours worked which shall be maintained
and verified by CLIENT.

5.  OASIS may hire or appoint an on-site administrative coordinator to implement terms and
conditions of this Agreement.

B.  Client personnel policies and procedures. OASIS agrees that it will assist CLIENT in developing and
maintaining a set of personnel policies and procedures in a manner designed to improve human
resources management in CLIENT's business. CLIENT acknowledges and agrees that OASIS is not
engaged in the practice of law or in the provision of legal services, and that CLIENT alone is completely
and independently responsible for its own legal rights and obligations for the acceptance and rejection
of personnel policies and procedures discussed with OASIS.

C.  Direction and Control. OASIS reserves and retains a right of direction and control over Assigned
Employees pursuant to this Agreement, Including authority to hire, terminate, discipline and reassign the
employees covered in this Agreement. CLIENT reserves the right to accept or cancel the assignment of
any assigned employee. In addition, CLIENT reserves sufficient direction and control over the Assigned
Employees as is necessary to conduct CLIENT's business and without which CLIENT would be unable
to conduct business. discharge any fiduciary responsibility that it may have, or comply with any
applicable licensure, regulatory, or statutory requirement of CLIENT. CLIENT acknowledges that it is
responsible to maintain a safe working environment, provide proper training in compliance with State.

Exhibit **A**

Federal, and OSHA standards, and establish and maintain such safety programs, safety policies and safety committees as may be required by law. OASIS shall secure workers compensation coverage in such amounts as is required by applicable law. In addition, OASIS shall provide such for the promulgation and administration for employment and safety policies, and responsibility for the management of workers compensation claims, claims filings, and related procedures as is required by applicable law. However, CLIENT acknowledges that OASIS in either providing or not providing such assistance assumes no liability, and in particular assumes no responsibility for unsafe equipment or workplace (including all types of vehicles) utilized by CLIENT.

D. Indemnification. Not withstanding the provisions of item III.(G) below, OASIS hereby unconditionally indemnifies, holds harmless, protects and defends CLIENT, and all subsidiaries, affiliates and parent companies, their shareholders, employees, attorneys, officers, directors, agents and representatives from and against any and all claims, demands, damages, injuries, deaths, actions, costs and expenses (including attorney's fees and expenses at all levels of the proceedings), losses and liabilities of whatever nature (including liability to third parties), and other consequences of any sort, arising out of the negligent or willful failure of any non-assigned employee employed by OASIS at its corporate office to comply with applicable workers compensation, withholding tax, or ERISA laws, rules and regulations, or where any action is taken by CLIENT in compliance with a written corporate OASIS policy, procedure, or direction which is illegal under any applicable local, state or federal law.

E. Assigned Employees. OASIS agrees to furnish to CLIENT Assigned Employees to perform job functions identified by workers' compensation code classifications. CLIENT warrants that the list of workers' compensation classifications is accurate and complete; that employees performing these job functions do so at the locations specified in this Agreement (Exhibit A) as client location. CLIENT understands and agrees that prior written approval from OASIS's workers' compensation carrier must be obtained prior to the addition of any workers' compensation classification or location to this Agreement.

F. Services. OASIS will provide only the above listed services and no other services shall be provided or implied, including without limitation any strategic, operational or business related decisions with regard to CLIENT's business. Such decisions shall exclusively be the responsibility of CLIENT; and, OASIS shall bear no responsibility nor liability for any actions or inactions by CLIENT. When implementing such decisions, whether or not the actions are implemented by Assigned Employees, CLIENT shall be acting solely on its own volition and responsibility. If OASIS is assigning any supervisory Assigned Employees to CLIENT, such supervisory Assigned Employees' scope of employment is strictly limited to the duties assigned by the CLIENT. Supervisory assigned employee actions which are in violation of law or which result in liability will be outside their scope of responsibility as OASIS supervisory Assigned Employees and in such an event supervisory Assigned Employees will be acting solely as the agents of CLIENT.

G. Notice. OASIS will provide notice of this agreement, explaining the relationship between OASIS and CLIENT, to all Assigned Employees subject to it in accordance with all applicable Federal and State laws.

IV. RIGHTS & DUTIES OF CLIENT.

A. Day to day supervision. CLIENT will be responsible for the day-to-day supervision and control of Assigned Employees under this agreement. CLIENT will verify skills and references to determine employment eligibility of Assigned Employees. CLIENT agrees to provide all facilities, supplies, equipment, and all other necessary items that may be required by Assigned Employees to perform their assigned employee services.

B. Payroll information. CLIENT agrees that it will maintain and provide to OASIS at the end of each pay period records of actual time worked by each assigned employee, verify Assigned Employees' exempt or non-exempt status, and verify that all hours worked by Assigned Employees are accurate and are in accordance with the Fair Labor Standards Act and other laws administered by the U.S. Department of Labor's Wage and Hour Division and any other applicable state and federal law. CLIENT shall verify that such time records are approved, verified and signed by each assigned employee and appropriate supervisor each pay period. These records submitted to OASIS shall become the basis for OASIS to issue all payroll checks. OASIS shall not be responsible for incorrect, improper or fraudulent records of hours worked, or for the improper determination of exempt status. Should CLIENT fail to meet the processing and payment schedule, the delivery of payroll checks by OASIS may be delayed and an out of cycle processing charge may be billed to CLIENT at the option of OASIS. Similarly, any changes to the hours reported to OASIS after the reporting time may be subject to an out of cycle charge at the option of OASIS.

C. Unpaid benefits. CLIENT will pay for any accrued but unpaid benefits due to Assigned Employees upon termination of employment, including but not limited to, unused vacation leave. CLIENT also agrees to pay all accrued but unpaid benefits due Assigned Employees if this Agreement is terminated for any reason.

D. Workplace Safety and Workers' Compensation Compliance.

1. Compliance. CLIENT agrees that it is primarily responsible for complying with all health, safety, and environmental rules, regulations, and statutes and that it will comply at its expense with all safety, health and work environment laws, regulations, ordinances, directives, notices, warnings, and rules imposed by controlling federal, state and local governments, including, but not limited to OSHA and it will immediately report to OASIS, before the end of the current work day or shift, all accidents and injuries involving Assigned Employees. CLIENT agrees to provide OASIS with a complete list of hazardous materials that Assigned Employees may come into contact with, the proper method of handling, and the dangers of each in conformity with the law and Material Safety Data Sheets for each such material. CLIENT also agrees to comply at its expense with any reasonable directives from OASIS, its workers' compensation carrier or any government agency having jurisdiction over the work place, health and safety. CLIENT shall provide all Assigned Employees protective equipment, as required by federal, state or local law, regulation, ordinance, directive or rule or as deemed necessary by OASIS or its workers' compensation carrier. OASIS, its workers' compensation carrier and its liability insurance carriers shall have the right to inspect CLIENT's premises to insure that Assigned Employees are not exposed to abatable recognized hazards. In no event shall this right, the exercise of this right or the non-exercise of this right affect any of CLIENT's obligations to OASIS, its indemnification to OASIS, Indemnified Parties or the Assigned Employees specified in this Agreement, or to any other person or entity.

2. Alternate workers compensation policies. In the event that applicable law requires CLIENT or if CLIENT elects to maintain its own policy of workers' compensation insurance, or a lawful alternative to same, CLIENT shall cause OASIS to be named as alternate employer, or an additional insured on said policy or alternative coverage. In addition, in such situations where CLIENT maintains its own workers compensation policy, CLIENT shall at no time directly pay any workers compensation premiums but shall instead, at least fourteen (14) days prior to the premium due date, remit to OASIS by overnight mail, next day delivery service, a cashiers check sufficient to cover the premium due from CLIENT or OASIS. CLIENT may also provide OASIS, at its option, to direct debit the account of CLIENT for the premiums due to the carrier. OASIS shall have no responsibility in such situation where CLIENT retains its own workers compensation policy other than to remit to the carrier such payments as CLIENT forwards to OASIS.

3. Transitional Duty Assignments/Drug Free Workplace. CLIENT agrees to comply with OASIS's workers compensation transitional duty requirements. CLIENT also agrees to comply with Drug Free Workplace policies, if any, adopted by OASIS.

E. Insurance.

1. Automobile, Liability, Property, Malpractice and Errors & Omission Protection. If any assigned employee is required to drive a vehicle of any kind for CLIENT, CLIENT will furnish and keep in full force and effect during the term of this Agreement liability insurance to include coverage for public liability, both bodily injury and property damage, with a minimum combined single limit of One Million Dollars ($1,000,000) and uninsured motorist coverage with a minimum combined single limit of Sixty Thousand Dollars ($60,000), or the minimum limit required by applicable state law, whichever is higher. If an assigned employee performs any duties in a professional capacity, CLIENT agrees to exercise such direction and control over said employee sufficient to comply with all applicable laws, and CLIENT shall furnish malpractice insurance which shall cover any acts, errors or omissions, including, but not limited to, negligence. The employee shall be deemed the employee of CLIENT for the purposes of this insurance. CLIENT agrees to cause its insurance carrier(s) to name OASIS as additional insured on CLIENT's policy and shall provide evidence of such coverage, and shall issue a Certificate(s) of Insurance evidencing same to OASIS allowing not less than thirty (30) days' notice of cancellation or material change. CLIENT agrees to file against such policy exclusively with respect to any claim for malpractice or errors and omissions or any other claim covered thereunder for any assigned employee engaged in the performance of licensed and/or professional duties. CLIENT agrees to indemnify, hold harmless, protect and defend OASIS and Indemnified Parties, or to cause its insurance carrier to indemnify, hold harmless, protect and defend OASIS from and against any and all liabilities of any kind, including costs and attorney's fees arising out of any such claim, as more fully set forth in Section IV(G).

2. General Liability Insurance Protection. CLIENT agrees to keep in full force and effect at all times during the term of this Agreement, a comprehensive general liability insurance policy in the minimum limit of One Million Dollars ($1,000,000) insuring CLIENT against bodily injury and property damage liability caused by CLIENT's premises, operations, completed operations and/or

products. Said policy shall also include blanket contractual liability and personal injury liability. CLIENT shall provide OASIS with a certificate of insurance naming OASIS as additional insured, and to provide OASIS with thirty (30) days' notice in the event of cancellation of coverage. CLIENT agrees that with respect to any claim or event alleging or resulting in bodily injury or property damage that involves an assigned employee, CLIENT agrees to indemnify OASIS and file for recovery under CLIENT's appropriate liability insurance policy.

3. CLIENT is required for its own protection to secure all necessary forms of liability insurance that CLIENT would feel be reasonably essential to have if OASIS Assigned Employees were the employees of CLIENT.

F. Indemnification. Without regard to the fault or negligence of any party, CLIENT hereby unconditionally indemnifies, holds harmless, protects and defends OASIS its subsidiaries, affiliates, related, and parent companies, their respective shareholders, non-Assigned Employees, attorneys, officers, directors, agents and representatives (all indemnified parties referred to as "Indemnified Parties") from and against any and all claims, demands, damages (including liquidated, punitive, and compensatory), injuries, deaths, actions and causes of actions, costs and expenses (including attorney's fees and expenses at all levels of proceedings), losses and liabilities of whatever nature (including liability to third parties), and all other consequences of any sort, without limit and without regard to the cause or causes thereof or the negligence of OASIS or any Indemnified Party, that may be asserted or brought against OASIS or any Indemnified Party which is in any way related to this Agreement, to equipment or vehicles utilized by Assigned Employees, the products and/or services provided by CLIENT, any claims of negligence, the actions of any assigned employee employed by CLIENT, or of any other individual, including without limitation any violation of any local, state and/or federal law, regulation, ordinance, directive or rule whatsoever, and all employment related matters other than those excluded by item III. (D) above.

G. Special Benefits Administration Agreement.

1. Health Benefits. If this agreement is terminated for any reason, CLIENT shall take all necessary action to replace health care coverage for Assigned Employees covered by this Agreement so as to avoid the implication of a qualifying event as defined by Internal Revenue Code ("IRC") §4980B. If CLIENT fails to provide such health care coverage, OASIS shall be obligated to extend continuation of its health care coverage in accordance with IRC §4980B, and CLIENT shall then remit to OASIS the cost per assigned employee to provide such coverage, and a one time charge of $ 500 per affected assigned employee. CLIENT agrees that this sum is fair compensation to OASIS for its expense in extending the coverage to Assigned Employees which were covered under this Agreement.

2. Cobra Notifications. CLIENT agrees to comply with the provisions of IRC §4980B and to notify OASIS of any event that would constitute a qualifying event under said statute as soon as it becomes aware of said event. If CLIENT fails to notify OASIS of a qualifying event under IRC and §4980B CLIENT shall be liable for any and all costs or penalties incurred by OASIS as the result.

3. Retirement plans. To assure compliance with the Internal Revenue Code, the Employee Retirement Income Security Act and other related federal regulations, CLIENT certifies that it has properly disclosed the following to OASIS on the required Retirement Plan Questionnaire: (1)any retirement plans currently or previously maintained by the CLIENT or any related entities (within the meaning of the Internal Revenue Code sections 414(h), 414 (c)); (2) listed all of the owners, officers and shareholders (to identify those highly compensated and key employees for purposes of discrimination and top heavy testing) ; (3) listed/entered any family relationships for owners, officers and shareholders with Assigned Employees. In the event that CLIENT has failed to properly identify and/or properly complete the Retirement Plan Questionnaire, CLIENT agrees to unconditionally hold harmless, indemnify, protect and defend OASIS and Indemnified Parties or any and all liabilities arising therefrom.

Prior to CLIENT merging its retirement plan into the qualified OASIS retirement plan or prior to CLIENT transferring assets from its qualified retirement plan into OASIS's retirement plan, CLIENT understands and agrees that OASIS shall have the right to inspect all retirement plan documents, records, IRS determinations, etc. for compliance with the law.

CLIENT also understands and agrees that if this Agreement is terminated and the CLIENT does not adopt a successor retirement plan and arrange for a transfer of assets from OASIS retirement plan within three (3) months of the termination date, all Assigned Employees covered under OASIS retirement plan will become fully vested in their account balances. Furthermore, CLIENT agrees to reimburse OASIS an administrative fee in the amount of $500 per annum or any part thereof plus $25 per assigned employee per annum or any part thereof for administering this provision.

If CLIENT maintained a retirement plan during the plan year (January 1 though December 31) prior to merging its retirement plan with OASIS's retirement plan, CLIENT agrees to provide OASIS with all required information (including but not limited to Box 1 wages and assigned employee deferrals, employer matches, and contributions, etc.) prior to merging its retirement plan with OASIS's retirement plan so OASIS may conduct discrimination testing on a combined basis for the first plan year.

CLIENT agrees that in the event OASIS's retirement plan as adopted by CLIENT becomes top heavy as defined by the prevailing Internal Revenue Code and/or regulations, CLIENT will be solely responsible for making a contribution to non-key employees to satisfy the top heavy test, or CLIENT participants may be subject to returned deferrals.

In addition, CLIENT further warrants that no covered assigned employee is receiving compensation from CLIENT that is not paid by OASIS. CLIENT understands that any payment made to any assigned employee outside this Agreement may result in OASIS retirement plan being disqualified. Should OASIS retirement plan be disqualified as a result of CLIENT failing to report any compensation to covered Assigned Employees, CLIENT will be solely liable for any damages of any nature arising out of the failure to report such compensation to OASIS.

H.  Automatic Termination Conditions. In the event that any one or more of the following conditions occurs, this Agreement will be deemed to have terminated at least twenty four (24) hours immediately before the first of said event(s): (a) any condition of CLIENT which could fit the definition of financial distress under the Worker Adjustment and Retraining Notification Act; (b) the filing by CLIENT of any petition for reorganization or bankruptcy; (c) the closing of any facility or operation where 25% or more of CLIENT'S workforce are Assigned Employees; (d) for non-payment of invoice. OASIS may also terminate this Agreement if, at any time, OASIS in its sole discretion determines that a material adverse change has occurred in the financial condition of CLIENT, or that CLIENT is unable to pay its debts as they become due in the ordinary course of business. This Agreement may also be terminated at any time by OASIS in the event of any Federal, State, or Local legislation, regulatory action or judicial decision which, in the sole discretion of OASIS, adversely affects its interest under this Agreement. Any such termination shall not relieve CLIENT of any obligations set forth herein, including but not limited to its payment obligations to OASIS.

CLIENT agrees it will comply with the Worker Adjustment and Retraining Notification Act and that it will give OASIS at least sixty-two (62) day notice prior to effecting any plant closing or mass lay-off where 25% or more of CLIENT'S workforce are Assigned Employees as defined by law.

I.  Client Compliance. CLIENT warrants that, all wages and benefits for all past and present assigned employee(s) are current and that there is no liability for same to which OASIS and Indemnified Parties could succeed. CLIENT expressly agrees to indemnify, hold harmless and defend OASIS and Indemnified Parties from any and all liabilities, known or unknown, including without limitation costs and attorneys' fees, which could arise out of any allegation, assertion or claim that OASIS or Indemnified Parties are a successor employer of CLIENT.

J.  Compliance with Federal, State, and Local Laws.

1.  CLIENT acknowledges, understands and agrees that, notwithstanding any other provisions of this Agreement, the fees charged by OASIS and remitted by CLIENT are not intended to compensate OASIS for the risk associated with the liabilities which may arise out of the improper management of Assigned Employees or for the violation of various local, state, and federal employment statutes. CLIENT is responsible for complying with all federal, state and local laws, regulations and ordinances including, but not limited to, those relating to employment labor and wage and hour issues, safety and health, environmental issues, hazardous waste, access to CLIENT'S premises, and accommodation of protected individuals under the law, just as if, and to the same extent as if this Agreement did not exist.

2.  Premises & Accommodation Liability (ADA). The parties agree that any exposure, risk or liability for said access or accommodation or failure thereof, whether imposed by the Americans with Disabilities Act or some other federal, state or local statute, law or regulation, shall be the sole responsibility of CLIENT.

3.  Family and Medical Leave Act (FMLA) Compliance. It shall be CLIENT's sole responsibility to determine the size of its work force, the number of hours of work required to meet the market demand for CLIENT'S service and/or product, assigned employee scheduling, and the suitability of individuals for any specific job duties. Accordingly, for purposes of determining whether and to what extent any individual worker can be allowed to take time off away from work for any purpose, and to what extent if any such time off would require the assignment of a replacement worker, CLIENT shall have the primary responsibility for making such determinations, and OASIS shall have the secondary responsibility for implementing such aspects of said determinations as may be

appropriate under this Agreement. CLIENT shall be solely responsible for all costs to comply with the FMLA, including without limitation the cost of securing a replacement job position for any worker covered by this agreement, and the cost of any benefit plan coverage associated with FMLA compliance. CLIENT shall pay all costs associated with any person placed in a job vacancy created in compliance with FMLA. CLIENT further agrees that it will at all times comply with the Family and Medical Leave Act ("FMLA") and CLIENT's responsibilities to reinstate employees and in all other manner to comply with the FMLA shall survive termination of this Agreement.

K.  OASIS will notify Assigned Employees of this Agreement at inception and termination of this Agreement. CLIENT shall also immediately upon termination of this Agreement notify Assigned Employees of the termination of this Agreement and inform them that they are no longer covered by OASIS's workers compensation policy.

L.  All indemnification's survive the termination of this Agreement.

M.  CLIENT has the duty to cooperate and that duty to cooperate is material to OASIS's duty to perform.

N.  Legal Counsel. OASIS does not provide legal advice. CLIENT acknowledges its responsibility to seek, as it sees fit, whatever legal counsel or advice it deems appropriate or necessary and that it will in no event consider any service, information or suggestion provided by OASIS as anything constituting legal advice or opinion.

V.  SERVICE FEES.

A.  Set Up Fees. On or before the commencement date, CLIENT will pay to OASIS an initial enrollment fee for each position shown on Exhibit A attached hereto. A set up fee will also be due when new Assigned Employees are added to CLIENT's payroll (including replacement Assigned Employees for those listed on Exhibit A and any Assigned Employees hired for newly established positions).

B.  The Administrative Fee. The Administrative Fee charged to CLIENT and payable at the end of each pay period will be equal to the rate specified on Exhibit A. Any increase or decrease in the Administrative Fee for statutory increases in employment taxes, shall be effective on the date of such increase or decrease. Workers' compensation and employee health benefit costs will also be adjusted as of the effective dates. A thirty (30) day notification shall be required of OASIS before changes are to be made in OASIS's Administrative Fee (see Exhibit A) charged to CLIENT.

CLIENT expressly agrees and understands that no assigned employee shall become employed by OASIS, covered by OASIS's workers' compensation insurance or any other benefit or term and condition of employment or issued a payroll check, unless the individual has prior to commencing work, completed OASIS's new hire packet employment form (which includes but is not limited to the W-4 & I-9) all of which must be delivered to OASIS before the assigned employee commences employment. OASIS shall not be considered to be an employer of any individual for any CLIENT until that individual completes this form and CLIENT is notified that the individual has been hired by OASIS as an assigned employee. In addition, OASIS shall not be considered to be an employer of any individual (except as may be required by law) for whom payroll information is not supplied during any payroll period. CLIENT assumes full responsibility for workers compensation claims of individuals paid directly by CLIENT, as well as for other parties hired by or working for CLIENT, whether as an employee, independent contractor, or in any other status.

C.  Other Service Fee Components. CLIENT will pay, at the end of each regular or special pay period all additional costs or expenses incurred at the request of CLIENT, including replacement personnel or temporary personnel provided by OASIS, any assigned field supervisor, safety engineering, fidelity bonding, professional liability insurance, overnight mail charges, continuing education, etc.

D.  Payments. All payments to OASIS by CLIENT will be made upon presentation via a bank draft or direct debit to an account of CLIENT. A late payment charge of two (2) percent will be added to all accounts not paid when due. Bank drafts returned unpaid from CLIENT's bank will be subject to the late payment charge plus any additional costs incurred by OASIS. An unpaid balance will also be subject to a periodic charge of one and one-half (1 and 1/2) percent per calendar month until paid. OASIS reserves the right to suspend the services to CLIENT until full payment has been made of any amount past due.

VI.  GENERAL PROVISIONS.

A.  Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes any and all agreements, whether oral or written, between the parties with respect to its subject matter. If an action is brought by either party hereto for breach or default of any provision of this Agreement, the prevailing party in such action shall be awarded reasonable attorneys' fees and costs in addition to any other relief to which the party may be entitled.

B. Modification. This Agreement may not be altered or amended except by written agreement duly executed by all parties hereto.

C. Successors. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

D. Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and such counterparts shall together constitute but one and the same agreement, binding upon all the parties hereto, notwithstanding that all the parties are not signatories to the original of the same counterpart.

E. Headings. The headings and labels of the paragraphs of this Agreement are inserted solely for the convenience of reference, and in no way define, limit, extend or aid in the construction of the scope, extent or intent of this Agreement or of any term or provision hereof.

F. Severability. Should any term, warranty, covenant, condition or provision of this Agreement be held to be invalid or unenforceable, the balance of this Agreement shall remain in force and shall stand as if the unenforceable part did not exist.

G. Arbitration and Mediation. All disputes and alleged breaches arising out of or relating to this Agreement shall be resolved by way of mediation and arbitration as set forth herein, and the parties hereto waive their rights to bring an action in State or Federal court to resolve such disputes. If a dispute under this Agreement arises, either party may serve written notice on the other that it desires to have the dispute submitted to mediation in accordance with the procedures of the Federal Mediation & Conciliation Service, pursuant to Chapter 44 & 682, Florida Statutes or as otherwise agreed by the parties to the dispute. Once elected, a mediation conference shall be scheduled within 30 days in the City of Palm Beach Gardens, Florida. If the dispute is not resolved through mediation, the parties shall submit their dispute to binding arbitration within 30 days after impasse is declared by a mediator. The Arbitration shall be conducted by a committee of arbitrators (one appointed by OASIS, one appointed by CLIENT and one appointed by the two arbitrators so appointed), in the City of Palm Beach Gardens, Florida, and pursuant to the terms of the American Arbitration Association and their decision shall be final and binding on both parties. Judgment may be obtained on the arbitration award in any court of competent jurisdiction. Completion of mediation until resolution or impasse is a condition precedent to arbitration.

H. Choice of Law. The substantive law of the state of Florida shall control the construction of this Agreement.

I. Waiver. The failure of any party to enforce at any time the provisions of this Agreement shall not be construed as a waiver of any provision or of the right of such party thereafter to enforce each and every provision of this Agreement.

J. Assignment. CLIENT shall not transfer or assign this Agreement or any part thereof without the prior written consent of OASIS. This Agreement may be assigned by OASIS at its sole discretion.

K. Default & Termination. In addition to the means of termination specified in §IV(H) above, this Agreement may also be terminated by CLIENT's default, at OASIS's sole discretion. Acts of default by CLIENT shall include:

    1. Failure of CLIENT to pay any monies due under this Agreement.

    2. Failure of CLIENT to comply within the time specified by OASIS with any directive of OASIS when such directive is promulgated or made necessary by (i) a federal, state or local governmental body, department or agency, (ii) an insurance carrier providing coverage to OASIS and/or the Assigned Employees and/or (iii) specific circumstances which currently or potentially affect OASIS, CLIENT or Assigned Employees covered by this Agreement.

    3. Direct payment of taxable wages by CLIENT to Assigned Employees for services contemplated by this Agreement.

    Any breach or default of any material term or condition of this Agreement shall, unless the innocent party elects otherwise in writing, cause immediate termination of this Agreement. Notwithstanding same, the innocent party is required to provide immediate written notice of any material breach or default. The effective date of termination shall be deemed to be the date the violation occurs, not when discovered or when notice is received by either party.

L. Notices. Any notice, request, demand or other communication required or permitted hereunder shall be deemed to be properly given when deposited with the United States Postal Service, postage prepaid, or when deposited with a public telegraph for transmittal, charges prepaid and addressed:

1. In the case of OASIS send to: Legal Department, Oasis Outsourcing, Inc. 4200 Wackenhut Drive, Suite 100, Palm Beach Gardens, FL 33410 or to such other person or address as OASIS may furnish to CLIENT.

2. In the case of CLIENT, to the address shown on Exhibit A, or to such other person or address that CLIENT may furnish from time to time to OASIS.

M.  Time Is Of The Essence. Time is of the essence in the performance of this Agreement.

N.  No Third Party Beneficiaries. The parties acknowledge and agree that this Agreement creates no rights for or in favor of any person or third party not a party to this Agreement, and that no such person may place any reliance hereon.

O.  Acknowledgments. CLIENT acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement including but not limited to any statement made by any marketing agent of OASIS. CLIENT acknowledges that OASIS has made no representations whether OASIS will improve the performance of CLIENT's business.

CLIENT acknowledges that OASIS shall not be liable for any CLIENT loss of business, good will, profits, or other damages.

CLIENT specifically authorizes and acknowledges OASIS will conduct a credit and background reference check on CLIENT and such officers, supervisors, and/or employees of CLIENT as OASIS deems appropriate in compliance with the requirements of law.

This CLIENT acknowledges the Agreement shall be valid and enforceable only upon the signature by an authorized Controlling Person of OASIS.

CLIENT acknowledges that it would be essential to OASIS to have complete knowledge of any government investigation or inquiry or private adversary action which could in any manner impact upon the types of duties contemplated by any Agreement. For example, but not by limitation, an audit by the Bureau of Workers' Compensation could affect the performance of functions under this Agreement. Therefore CLIENT hereby makes complete and full disclosure of any such administrative proceeding (including but not limited to EEOC, NLRB, OSHA and Wage & Hour matters), investigation, lawsuits, or other adversary proceeding, including those which are threatened as well as those not yet asserted, in which CLIENT has been involved during the last five (5) years.

SIGNATURE

CLIENT

Signature: _____     Date  7 - 12 - 00

Print Name and Title  Louise / Lynch _____

OASIS OUTSOURCING INC.

Signature: _____     Date _____
Daniel S. McHenry, Controlling Person

# ADDENDUM
# TO
# CLIENT SERVICE AGREEMENT

1.    The following language shall modify the mentioned portion of Paragraph G, Special Benefits Administration Agreement, Subparagraph 1, Health Benefits:

> ". . . and a one time charge of $100 per affected assigned employee CLIENT agrees that the sum is fair compensation to OASIS for its expense in extending the coverage to Assigned Employees which were covered under this Agreement."

2.    The following language shall modify the mentioned portion of Paragraph G, Special Benefits Administration Agreement, Subparagraph 3, Retirement Plans:

> "Furthermore, CLIENT agrees to reimburse OASIS an administrative fee in the amount of $25 per assigned employee per annum or any part thereof for administering that provision."

3.    Subparagraph J, Assignment, shall be amended as follows:

> "CLIENT or OASIS shall not transfer or assign this Agreement or any part thereof without the prior written consent of the other.

Dated this _12_ day of July, 2000.


PORT ROYALE TRADING CO.                    OASIS OUTSOURCING, INC.

By:_____                By:_____
Print:_LOUISE___LYNCH_                          Daniel S. McHenry, Controlling Person


S:\WORK\J\CKY\ADDENDUM

# Exhibit A

TO CLIENT SERVICE AGREEMENT DATED_____

| | |
|---|---|
| Client Name: | **Port Royale Trading Co., Inc.** |
| Client Address: | **1375 N.W. 89th Ct.** |
| City: | **Miami** State: **FL** Zip: **33172** |
| Phone Number: | **305-477-5551** Fax Number: **305-477-9165** |
| | Payroll Contact: |
| Owner's Name: | *Louise Lynch* |

## STAGE I: SCHEDULING

Client Location:

Initial Payroll Cycle: **Weekly**

| | Day of Week | A Date | B Date | C D... |
|---|---|---|---|---|
| **Begins** | 8-3-00 | | | |
| **Ends** | 8-8-00 | | | |
| **Check Date** | 8-11-00 | | | |

Pay Cycle: **Weekly**
Benefits Effective: _9-1._
Pre-Orientations:
Orientation Time:
Orientation Date:

## STAGE II: ELECTIONS & DISCLOSURES

Payroll will be transmitted to the OASIS via _____ Fax or _____ remote dat...

| Yes | No | |
|---|---|---|
| ✓ | | Client agrees to post-accident and pre-employment drug testing. |
| | ✓ | Client agrees to post-accident drug testing only. |
| | ✓ | Client agrees to conduct background checks _____ selected positions _____ all new hires. |
| | ✓ | Client elects the Employee Assistance Program ("EAP") for $2.00 a month per employee. |
| ✓ | | Client will be covered under the Oasis Employment Practice Liability Insurance Program. |
| ✓ | | Client will be covered under Oasis Workers' Compensation policy. |
| ✓ | | Client will be covered under Oasis Medical plans. |
| | ✓ | Have there been any actions by a regulatory agency in the last five years? |
| | ✓ | Has there been any litigation in the last five years? |
| | ✓ | Are there any contingent liabilities not noted above? |
| | | If yes, explain _____ |

Exhibit A

## STAGE III: BILLING RATES BY WORKERS' COMPENSATION CODES

| W/C Code | Description | Oasis Administratie |
|----------|-------------|---------------------|
| 8810 | Clerical | 111.08% |
| 8742 | Out Side Sales | 111.44% |
| 8021 | Fish and Seafood Handler | 118.07% |
| 7380 | Drivers | 119.41% |
| | | |
| | | |
| | | |

**Note:**

1. The total rate shall be reduced by the percentages set forth above once the applicable taxable wage limits on state and federal unemployment have been met.

2. The total rate shall be reduced by the applicable tax rates for FICA and Medicare. And do not include any State or Local

3. Oasis will reimburse client for re-payment of payroll taxes FUTA and SUTA

## STAGE IV:   INITIAL INVESTMENT TERMS UPON START-UP

| | | |
|---|---|---|
| Deposit | $ - | |
| 37 Full time employees @ $35. Ea | $ 1,295.00 | |
| 0 Part time employees @ $15. Ea | $ - | |
| **TOTAL INITIAL INVESTMENT** | **$ 1,295.00** | |

**Enrollment fees:**   The client shall pay to Oasis a one-time enrollment fee of $ 35 for full time employees and $ 15 for part time employee converted to Oasis and for each replacement or additional employee added to Oasis.   *waived*

**Payroll delivery:**  The cost of payroll delivery to the Client's primary location is $12.50 per pay period. There will be an additional charge for delivery to each additional location.

_____  7/21/00
Client                          Date

_____
Oasis Outsourcing, Inc.

# Exhibit A

TO CLIENT SERVICE AGREEMENT DATED_____

| | |
|---|---|
| Client Name: | Port Royale Trading Co., Inc. |
| Client Address: | 1375 N.W. 89th Ct. |
| City: | Miami | State: FL | Zip: 33172 |
| Phone Number: | 305-477-5551 | Fax Number: 305-477-9165 |
| | Payroll Contact: |

Owner's Name: *Louise Lynch*

## STAGE I: SCHEDULING

Client Location:

Initial Payroll Cycle:

|  | Day of Week | A Weekly Date | B Date | C Dr |
|---|---|---|---|---|
| Begins | 8-3-00 | | | |
| Ends | 8-8-00 | | | |
| Check Date | 8-11-00 | | | |

Pay Cycle:       Weekly
Benefits Effective:    9-1
Pre-Orientations:
Orientation Time:
Orientation  Date:

## STAGE II: ELECTIONS & DISCLOSURES

Payroll will be transmitted to the OASIS via _____Fax or _____ remote dat

| Yes | No | |
|---|---|---|
| | ✓ | Client agrees to post-accident and pre-employment drug testing. |
| | ✓ | Client agrees to post-accident drug testing only. |
| | ✓ | Client agrees to conduct background checks _____ selected positions _____ all new hires. |
| | ✓ | Client elects the Employee Assistance Program ("EAP") for $2.00 a month per employee. |
| ✓ | | Client will be covered under the Oasis Employment Practice Liability Insurance Program. |
| ✓ | | Client will be covered under Oasis Workers' Compensation policy. |
| ✓ | | Client will be covered under Oasis Medical plans. |
| | ✓ | Have there been any actions by a regulatory agency in the last five years? |
| | ✓ | Has there been any litigation in the last five years? |
| | ✓ | Are there any contingent liabilities not noted above? |
| | | If yes, explain _____ |

Exhibit A

β

## STAGE III: BILLING RATES BY WORKERS' COMPENSATION CODES

| W/C Code | Description | Oasis Administratio |
|---|---|---|
| 8810 | Clerical | 111.08% |
| 8742 | Out Side Sales | 111.44% |
| 8021 | Fish and Seafood Handler | 118.07% |
| 7380 | Drivers | 119.41% |
| | | |
| | | |
| | | |

**Note:**

1. The total rate shall be reduced by the percentages set forth above once the applicable taxable wage limits on state and federal unemployment have been met.

2. The total rate shall be reduced by the applicable tax rates for FICA and Medicare. And do not include any State or Local

3. Oasis will reimburse Client for re-payment Of payroll rates FUTA and SUTA

## STAGE IV:   INITIAL INVESTMENT TERMS UPON START-UP

| | | |
|---|---|---|
| Deposit | $ | - |
| 37  Full time employees @ $35. Ea | $ | 1,295.00 |
| 0 Part time employees @ $15. Ea | $ | - |
| **TOTAL INITIAL INVESTMENT** | $ | 1,295.00 |

**Enrollment fee:**   The client shall pay to Oasis a one-time enrollment fee of $ 35 for full time employees and $15 for part time employee converted to Oasis and for each replacement or additional employee added to Oasis.     Waived

**Payroll delivery:**  The cost of payroll delivery to the Client's primary location is $12.50 per pay period. There will be an additional charge for delivery to each additional location.

_____  7/21/00
Client                                           Date

_____
Oasis Outsourcing, Inc.

Exhibit A

C