UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 04-22640-CIV-JORDAN

| | |
|---|---|
| EUGENIO GARCIA, | ) |
| Plaintiffs | ) ) |
| vs. | ) ) |
| PORT ROYALE TRADING CO., INC., LOUISE LYNCH, and OASIS OUTSOURCING, INC., | ) ) ) ) |
| Defendants | ) ) ) |

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

On October 20, 2004, Eugenio Garcia filed suit against Port Royale Trading Company, Inc. ("Port Royale"), Louise Lynch, and Oasis Outsourcing, Inc. ("Oasis") alleging inadequate compensation for overtime, in violation of the Fair Labor Standards Act ("FLSA" or the"Act"), 29 U.S.C. § 201 *et seq. See* Complaint [D.E. 1]. Specifically, Mr. Garcia alleges that, despite working an average of 60 to 70 hours per week during the relevant period, the defendants willfully and intentionally "refused to pay [him] the overtime wages and straight time wages" required under the FLSA. *Id.* at ¶¶ 10-12. The defendants filed motions, for summary judgment, arguing, essentially, that Mr. Garcia was in fact properly compensated under a fluctuating workweek ("FWW") compensation method pursuant to the FLSA; that the defendants had taken the requisite steps, pursuant to the FLSA, to inform Mr. Garcia about the FWW compensation scheme; and therefore, that no genuine issue of material fact existed as to the propriety of Mr. Garcia's overtime compensation under the FLSA [D.E. 27, 29 and 31].

For the reasons discussed below the defendants' motions for summary judgment are GRANTED.

### STANDARD OF REVIEW

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). In making this assessment, the court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Chsire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable doubts about the facts in favor of the nonmovant." *United States of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

## BACKGROUND

The facts of this case are straightforward. Mr. Garcia began working for Port Royale, a seafood wholesaler and distributor, as a delivery truck driver sometime in late 1994 or early 1995. *See* Complaint ¶ 9 [D.E. 1]; Deposition of Eugenio Garcia at 17 [D.E. 32]. When Mr. Garcia began his employment there, Port Royale compensated its drivers, including Mr. Garcia, hourly at a rate of $7.00 per hour. *See* Garcia Depo. at 32; Port Royale's Motion for Summary Judgment at 6 [D.E. 27]. In November 2001, Port Royale converted the hourly wage system to a fluctuating workweek ("FWW") compensation scheme after consulting with Oasis Outsourcing, the company Port Royale employed to provide it with payroll processing services, worker's compensation coverage, unemployment insurance coverage, and human resource guidance. Deposition of Paige McAllister at 4, 6 [D.E. 32]; Deposition of Richard Nichols at 18 [D.E. 32].[1]

Under the FWW system, Port Royale paid all of its drivers a fixed salary of $350 per week, based on a 40-hour work week, regardless of the number of hours worked each week, plus half-time for each hour worked in excess of 40 hours. *See* Garcia Depo. at 43; Nichols Depo. at 6-9. Thus, for example, if a driver worked less than 40 hours during a given week he would still receive $350

---

[1] Mr. Garcia received his weekly paycheck stubs/direct deposit receipts from Oasis after Oasis received the employee time cards and other requisite records from Port Royale and processed the payroll each week. Garcia Depo. at 30 and 46; McAllister Depo. 6-8, 10.

2

for that week. Likewise, if a driver worked more than 40 hours on any given week, he would receive his $350 salary plus one-half time the regular rate for hours over 40.

Consequently, Port Royale required each driver, including Mr. Garcia, to sign a Fixed Salary for Fluctuating Hours Agreement, [the "salary agreement"], and explained to all of its drivers, verbally, the contents of the agreement, noting that they would be paid a minimum of $350 per week, based on a 40-hour work week, and that they would receive half-time for each hour worked over 40 hours. *See* Nichols Depo. at 6-10. The salary agreement Mr. Garcia signed on November 27, 2001, reads in full as follows:

1.  I agree to a fixed salary of $350.00 per week, regardless of the number of hours worked each week.
2.  I understand that the hours of work fluctuate from week to week, but I will be compensated at the amount stated above for whatever hours actually worked in a given week. My hourly rate will vary form week to week and is computed by dividing the number of hours actually worked in a workweek by the agreed upon weekly salary.
3.  I acknowledge that the overtime rate is calculated at one-half times the regular hourly rate. This rate will be paid for all hours worked in excess of forty (40).
4.  I further acknowledge that this salary agreement does not constitute an employment agreement and my employment is "at will" in accordance with the provisions stated in the employment manual.

Defendant's Ex. 8 [D.E. 32]; Garcia's Depo. at 37 (presented with a signed copy of the salary agreement, Mr. Garcia testified that Port Royale explained the change in compensation and that the signature that appeared on that agreement was his). Thereafter, Mr. Garcia received a *weekly* pay stub (Mr. Garcia used direct deposit) from Oasis indicating the salary amount -- $350 -- and the total amount of half-time overtime wages earned for that week. The paychecks, however, did not indicate *the number of hours worked per week*. *See* Ex. 8

In October of 2004, Mr. Garcia left his position with Port Royale and initiated the instant lawsuit against the defendants, alleging he was improperly compensated under the FLSA overtime pay requirements, and essentially that he was entitled to time-and-one-half for each hour worked in excess of 40 hours, rather than the half-time he was paid, because he lacked a clear mutual understanding of the FWW method.

The defendants subsequently filed their respective motions for summary judgment. Oasis and Ms. Lynch argue that they do not constitute employers or joint employers and are therefore not liable to Mr. Garcia under the FLSA.[2] Even if they are considered employers or joint employers under the FLSA, Oasis and Ms. Lynch alternatively argue, along with Port Royale, that Mr. Garcia has failed to establish that he performed work for which he was not properly compensated or that the defendants wilfully violated FWW requirements under the FLSA.

## DISCUSSION

As a threshold matter, Oasis and Mr. Lynch argue that they are not liable to Mr. Garcia as employers under the FLSA. Specifically, both defendants argue that Port Royale had exclusive control over the terms and conditions of Mr. Garcia's employment, and that he was not economically dependent on either Oasis or Ms. Lynch. Consequently, they contend that they were not Mr. Garcia's employer or joint employer for purposes of FLSA liability, and that any claim against them for unpaid overtime wages should be dismissed. *See* Oasis' Motion for Summary Judgment [D.E. 31] and Ms. Lynch's Motion for Summary Judgment [D.E. 29]. The overwhelming weight of the evidence leads to a finding that Oasis was not an employer under the FLSA. Oasis had, at best, an attenuated connection to Mr. Garcia's employment with Port Royale, and that Oasis' only function in the instant lawsuit was as a payroll processor and consultant to Port Royale.

However, the record does not reflect so favorable a picture for Ms. Lynch. Indeed, a reasonable trier of fact could conclude that Ms. Lynch was liable to Mr. Garcia as an employer under the FLSA. Summary judgment in favor of the defendants is, nonetheless, appropriate because Mr. Garcia has not presented evidence suggesting the defendants improperly instituted the FWW compensation method, or that they improperly compensated him for overtime hours worked under that method, or that he did not have a clear understanding of the FWW method.

---

[2] Port Royale does not contest its status as Mr. Garcia's employer under the FLSA.

## A. FLSA EMPLOYER OR JOINT EMPLOYER LIABILITY

An "employer" under the FLSA is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C.§ 203 (d). The FLSA defines an "employee" as "any individual employed by an employer,"*id.* at §203 (e) (1). To "employ" means "to suffer or permit to work, *id.* at § 203 (g). Consequently, a person or entity "'suffers or permits' an individual to work if, as a matter of economic reality, the individual is dependent on the entity." *Antenor v. D&S Farms*, 88 F.3d 925, 929 (11th Cir. 1996) (citing *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1962)).

The "determination of the [employment] relationship does not depend on [any one] factor[ ], but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1997). The Eleventh Circuit has identified "at least eight factors that can be analyzed to determine whether an employment or joint employment relationship – that is, economic dependence exists," with the express warning that no one factor is determinative, and, as the Supreme Court explained in *Rutherford*, that "the existence of an employment relationship depends on the economic reality of *all the circumstances*." *Antenor*, 88 F.3d at 932 (internal citations omitted) (emphasis in original). Those factors are: (1) the nature and degree of control over the worker; (2) the degree of supervision over the worker; (3) the right to directly or indirectly hire fire or modify employment conditions; (4) the power to determine pay rates or methods of payment; (5) preparation of payroll and payment of worker's wages; (6) ownership of the facilities where work occurs; (7) performance of a line job integral to the defendant's business; and (8) investment in equipment and facilities. *See Antenor*, 88 F.3d at 932 (determining whether joint employment relationship existed between farm workers and growers) (citing to *Aimable v. long & Scott Farms, Inc.*, 20 F.3d 434, 440-46 (11th Cir. 1994). *See also Jeanneret v. Aron's East Cost Towing, Inc.*, 2002 WL32114470, *4-10 (S.D. Fla. 2002) (applying the *Antenor* factors and holding that payroll processing company that tow truck company hired did not constitute employer or joint employer of truck driver brining suit for unpaid overtime wages).

The record here, read in the light most favorable to Mr. Garcia, does not intimate, let alone create a genuine issue of material fact, that Oasis was an employer or joint employer under the FLSA. The record does, however, suggest that a reasonable trier of fact could conclude that Ms.

5

Lynch is liable to Mr. Garcia under the FLSA. The facts relevant to the inquiry of whether the defendants are liable to Mr. Garcia as employers under the FLSA are as follows.

Port Royale employed Oasis to carry out the following actions on Port Royale's behalf: cut payroll checks in amounts Port Royale dictated; submit payroll taxes to the appropriate government agencies; pay worker's compensation premiums to the worker's compensation carrier; and pay unemployment taxes. McAllister Depo. at 7-9; Nichols Depo. at 18. Oasis did not have any authority to hire, fire discipline, or reassign Port Royale employees. McAllister Depo. at 8-9. Likewise, Oasis did not have authority to determine the number of workers Port Royale hired, set workers' schedules, determine employees' job responsibilities, or manage any of the company's operational day-to-day activities. *Id.* Mr. Garcia has presented no evidence to the contrary. The only evidence Mr. Garcia presents in support of his contention that Oasis is his employer under the FLSA was that Oasis calculated the hourly pay rate under the FWW, calculated the half-time rate for overtime hours, prepared Port Royale's payroll, *see* Plaintiff's Response to Oasis' Motion for Summary Judgment at 5 [D.E. 5], and issued Mr. Garcia's check, *see* Garcia Depo. at 47, all on behalf of Port Royale.

Louise Lynch, one of Port Royale's shareholders and a corporate officer, worked at Port Royale managing accounts receivable and bill payment for approximately 20 years. *See* Deposition of Louise Lynch at 3-5 [D.E. 32]. Ms. Lynch, however, was not involved in any of the operational, business decision making day-to-day. *See id.* at 6-7. Ms. Lynch testified that Richard Nichols, another shareholder and employee, supervised "sales people, the warehouse people, and the truck drivers." *See id.* at 8. *See also* Garcia depo at 44 and 50. Ms. Lynch further testified that Mr. Nichols was also responsible for setting employee work schedules, including Mr. Garcia's, determining employee benefits, and setting employee wages. *See Lynch Depo.* at 14-15.

On this record, it is clear that Oasis was not Mr. Garcia's employer under the FLSA. Aside from Oasis's preparation of Port Royale's payroll, Mr. Garcia has presented no evidence showing that Oasis was anything more than a third-party provider of payroll processing and consulting services to Port Royale. As Ms. McAllister, an Oasis employee, testified, Oasis did not have any control or supervision over Mr. Garcia or any other Port Royale employees, *see* McAllister Depo. at 8 ("We do not direct the day-to-day control, for example setting schedules or doing the time

6

sheets. . . . Anything that is the day-to-day operations is Port Royale's responsibility.). *See also* Garcia Depo. at 47. Further, Oasis did not have any authority to hire or fire employees, or modify their employment conditions. *See* McAllister Depo. at 8 (". . . we don't hire, we don't fire, we don't discipline . . ."); Garcia's Depo. at 47 (when asked if Oasis set his hours, Mr. Garcia responded, "No, no. They're the ones who used to make that checks that I know of."). And while Mr. Garcia contends Oasis was integral in Port Royale's decision to institute the FWW method, Oasis' role in Port Royale's decision to switch to the FWW was advisory. *See* McAllister Depo at 6, 19; Lynch Depo. at 14. That compensation decision was ultimately made by Port Royale. Put simply, the record is devoid of any evidence suggesting that Oasis had any decision-making authority or financial interest – either via investments in equipment or facilities or via ownership in the business – in Port Royale's business. Taking the evidence as a whole, I find that Oasis' involvement in Mr. Garcia's employment with Port Royale is tenuous, at best. Aside from processing and issuing Mr. Garcia's weekly paycheck, and advising Port Royale about alternative compensation options, including the FWW, there is no evidence in support of Mr. Garcia's allegation that he was economically dependent on Oasis, and therefore, that Oasis maintained an FLSA-recognized employment relationship with Mr. Garcia. *See Antenor*, 88 F.3d at 932.

As to Ms. Lynch, there is no evidence that she had any control or supervision over Mr. Garcia. In fact, Mr. Garcia testified that Ms. Lynch had no supervisory authority over any of the truck drivers. *See* Garcia Depo. at 50 (when asked if Ms. Lynch had any authority over Mr. Garcia, he responded, "Not necessarily. No, no, no."). The record also reveals that she had no input in the hiring and firing decisions, or in the modification of employment conditions as those responsibilities were reserved for Mr. Nichols. Likewise, employee pay rates and method of payments were left to Mr. Nichols' discretion. This suggests that Ms. Lynch too is not liable to Mr. Garcia under the FLSA.

However, as Mr. Garcia points out, Ms. Lynch assisted in the preparation of payroll each week by forwarding the employees time cards to Oasis so that it could process Port Royale's payroll. *See* Lynch Depo. at 7. Furthermore, as one of Port Royale's shareholders, Ms. Lynch presumably maintained an ownership interest in Port Royale's facilities, as well as in any investment the corporation made in its equipment and facilities, though the record does little to explicate these two

points. Finally, the record unambiguously illustrates that, as a truck driver for a company which delivers seafood throughout Florida, Mr. Garcia performed an integral function for Port Royale, and ultimately its shareholders. These facts alone suggest an employment relationship between Ms. Lynch and Mr. Garcia indeed existed. Even so, Ms. Lynch's utter lack of involvement in the primary operational decisions, however, gives me pause, particularly in light of *Dole v. Elliot Travel*, 942 F.2d 962 (6th Cir. 1991), a Sixth Circuit decision which Mr. Garcia, ironically, relies on in support of the opposite conclusion -- that Ms. Lynch was an employer for purposes of FLSA liability -- but whose analysis I, nonetheless, find persuasive.

*Dole* involved a suit by the Secretary of Labor against a travel agency and its president for unpaid overtime wages. Among the questions before the panel was whether the president was an employer for purposes of FLSA liability. The panel held that the president, who owned 100% of the company's stock, was the chief corporate officer, was involved in all aspects of the business operations, controlled the purse strings, and made all "major corporate decisions," and was essentially the "top man" at the company, was in fact an employer under the FLSA. *See Dole*, 942 F.2d at 966. Here, although Ms. Lynch holds the title of secretary, and is responsible, essentially, for paying the company's bills, the record does not suggest that she is a primary shareholder, makes any "major corporate decisions," controls the purse strings, or is the top person at Port Royale. *Dole's* analysis suggests that, despite being a corporate officer with some ownership interest (though the record does not establish her percentage interest), an employment relationship does not necessarily exist in light of Ms. Lynch's lack of involvement in the central operational and strategic decision-making responsibilities at Port Royale – a fact that was central to the *Dole* court's holding.

Nonetheless, the question before me on summary judgment is whether a reasonable trier of fact could conclude that an employment relationship existed under the FLSA. Taking the facts in the light most favorable to Mr. Garcia, it is indeed plausible for a fact-finder to conclude, despite the differences between the defendant in *Dole* and Ms. Lynch, that her financial interests as a shareholder and corporate officer and her concomitant responsibilities for assuring the proper processing of the weekly payroll, suggest some economic dependence. Put differently, a genuine issue of material fact exists as to Ms. Lynch's status as an employer.

Any conclusion on the issue of whether Oasis or Ms. Lynch are employers under the FLSA is of little consequence because the record is replete with evidence that none of the three defendants acted contrary to the FLSA when instituting the new FWW payment policy. Accordingly, even assuming all defendants qualified as employers and could be subject to FLSA liability, the instant facts show no wrong doing, and summary judgment is appropriate.

### B. IMPLEMENTATION OF AND PROPER PAYMENT UNDER THE FWW METHOD

The Fair Labor Standards Act generally requires employers to compensate their employees at one and on-half times the employee's usual hourly wage, or "regular rate," for each hour worked over 40 hours. *See Davis v. Friendly*, 2003 WL 21488682, *1 (11th Cir. 2003) (citing U.S.C. § 207(a)(1)). But, the FLSA's implementing regulations permit employers to use alternative compensation schemes, like the fluctuating workweek method, to suit various employment needs. *See* 29 C.F.R. § 778.114. Under the FWW, which is typically used for employees whose hours fluctuate from week to week, the workweek is still capped at 40 hours, and any work in excess of 40 hours is considered overtime for which an employee must be paid. Employees are compensated at a fixed salary per week regardless of the number of hours worked (whether above or below 40 hours), and at one-half (or 50%) the regular rate, instead of one and one half time (or 150%) for each hour worked in excess of 40 hours.[3]

The regular rate under the FWW varies from week to week depending on the number of hours the employee actually works, and is calculated by dividing the fixed salary amount by the number of hours the employee actually worked that week.[4] *See* §778.114 (b). *See also O'Brien v.*

---

[3]"Payment for overtime hours at one half rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate under the salary arrangement." 29 C.F.R. § 778.114 (a).

[4]The regulation provides the following illustration of how the regular rate in an FWW schema is properly calculated. The example assumes the employee is paid a weekly salary of $250, and that in the course of four weeks the employee works 40, 44, 50, and 48 hours.

> [H]is regular hourly rate of pay in each of these weeks is approximately $6.25, $5.68, $5, and $5.21, respectively. Since the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay

9

*Town of Agawam*, 350 F.3d 279, 287 (1st Cir. 2003); *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 633 (5th Cir. 2001); *Davis*, 2003 WL 21488682 at *1.

---

> is due. For the first week the employee is entitled to be paid $250; for the second week $261.36 ($250 plus [four] hours at $2.84, or 40 hours at $5.68 plus [four] hours at $8.52); for the third week $275 ($250 plus 10 hours at $2.50, or 40 hours at $5 plus 10 hours at $7.50); for the fourth week approximately $270.88 ($250 plus [eight] hours at $2.61 or 40 hours at $5.21 plus [eight] hours at $7.82).

§ 778.114 (b).

Accordingly, this payment structure suggests that "the more the employee works and the "more overtime the employee logs, the less he or she is paid for each additional hour of overtime." *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1280 (4th Cir.1996). However, as long as the salary is large enough to assure that the average hourly earnings from the salary, during any workweek, do not fall below the minimum hourly wage rate of $5.15 per hour, *see* 29 U.S.C. § 206 (a) (1), the employer is in compliance with § 778.114.

The record does not suggest, nor does Mr. Garcia contend, that Port Royale was ever at risk of falling below $51.5 per hour on any given week. However, to the extent any doubt might exist as to the propriety of Port Royale's calculation of the regular rate, I resolve them here and note that for the pay periods from January 4, 2002, through July 19, 2002, Port Royale calculated the regular rate by dividing $350 by the number of hours Mr. Garcia worked that week. *See* Defendants' Documents in Support of Motions for Summary Judgment, Ex. 9. The regular rate ranged from $5.36 per hour, on January 4, 2002, to $8.64 per hour, never falling below the minimum wage rate. From approximately August 2, 2002, through October 8, 2004, Port Royale, to avoid weekly calculations and assure that the regular rate never fell below the statutory minimum wage, fixed the regular rate at $8.75 per hour (or $350 divided by 40 hours). *Id.* By doing so, Port Royale assured that the regular rate at which overtime was to be calculated would always exceed, regardless of the number of hours worked, the statutory minimum wage.

Accordingly, Port Royale erred in favor of Mr. Garcia when calculating the regular rate and thus the overtime rate during this latter period. Because the FLSA makes unlawful only underpayment of overtime wages, it seems counterintuitive and nonsensical to hold the defendants liable for such a "miscalculation" under § 778.114. *See* 29 U.S.C. § 216(b) (employer is liable only for unpaid minimum wages or unpaid overtime). In fact, the First Circuit has held that "where the [employee] received more overtime payment than she was entitled to under [§ 778.114], the [employer's] obligation under the FLSA was extinguished and summary judgment was appropriate." *Valerio v. Putnam Assoc., Inc.*, 173 F.3d 35, 43 and n. 6 (1st Cir. 1999). Although I am not willing to grant summary judgment merely on the basis of Port Royale's over-payment of overtime for this period, I am satisfied that Port Royale, based on the information provided by the parties, did not err in calculating the regular rate for purposes of determining Mr. Garcia's overtime pay.

In order for an employer to lawfully implement a FWW compensation program, it must satisfy several conditions: (1) the employees's hours must fluctuate from week to week; (2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums); (3) the fixed amount must be sufficient to provide compensation every week at a regular rate that is at least equal to the minimum wage under the Act -- that is, the salary must be "sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under the Act;" (4) the employer and employee must share a "clear mutual understanding" that the employer will pay that fixed salary regardless of the number of hours worked; and (5) the employee must be paid one-half time for each hour of overtime worked in excess of 40 hours, in addition to the fixed weekly salary. *See* § 778.114 (a) and (c). *See also O'Brien*, 350 F.3d at 287-88; *Davis*, 2003 WL 21488682 at *1; *Griffin v. Wake County*, 142 F.3d 712, 715 (4th Cir. 1998).[5]

Here Mr. Garcia essentially alleges that the defendants have violated the FLSA by failing to pay him overtime wages pursuant to the Act's requirements, and that he is entitled to time-and-one-half for each hour worked in excess of 40 hours, rather than one-half-time. He alleges that, due to a lack of a clear and mutual understanding "that the fixed salary was compensation for the hours

---

[5]The circuits differ on the question of who -- the employee bringing the claim or the employer instituting the FWW compensation schema -- bears the burden of proving non-compliance or compliance with § 778.114. In *Davis*, the Eleventh Circuit, adopting the Fifth Circuit's reasoning in *Samson*, 242 F.3d at 626, held, albeit in an unpublished opinion, that "the employee bears the burden of proving non-compliance with the fluctuating workweek method. *Id.* at *3. *See also Samson*, 242 F.3d at 636 (explaining that "the FWW method is one method of complying with the overtime payment requirements of 29 U.S.C. § 207(a)(1)," and that "it is not an exemption to it"; "[t]herefore, the employee bears the burden of proving that the employer failed to properly administer the FWW method"). However, the Fourth Circuit, in *Monahan v. County of Chesterfield*, places the burden on the employer to prove compliance with these requirements. 95 F.3d 1263, 1275 n.12 (4th Cir. 1996) ("We recognize that there is somewhat of a heightened burden placed on an employer utilizing the fluctuating workweek method of payment to demonstrate a 'clear mutual understanding of the parties that the fixed salary is compensation . . . for the hours worked each week, whatever the number.'").

While I find *Davis* and *Sampson* persuasive, I do not reach the burden of proof issue here because the record does not create an issue of fact on whether there was a clear mutual understanding that Mr. Garcia would be paid a $350 weekly salary regardless of the number of hours worked. In other words, summary judgment is appropriate even if the defendants bear the burden.

11

worked each workweek," the FWW method of compensation does not apply to him. *See* Complaint at ¶ 10-12; Plaintiff's response to Port Royale's Motion for Summary Judgment at 2 [D.E. 41]. I disagree. The record makes plain (1) that Mr. Garcia, himself, understood the parameters of the FWW compensation method -- namely that he would receive $350 per week regardless of the number of hours worked, and was even upset with the switch to the FWW method; and (2) that Port Royale took more than adequate steps to assure that its employees had a clear understanding of the new compensation plan. Accordingly, I do not find that a genuine issue of material fact exists as to whether the parties had a clear mutual understanding that the weekly salary covered for all hours worked. The defendants are, therefore, entitled to summary judgement on this claim.

Mr. Garcia's deposition testimony, during which he was presented with numerous of his paycheck stubs, both before and after Port Royale initiated the FWW method, suggests that he was quite aware, to the point of frustration, that he would receive $350 per week regardless of the number of hours worked:

> Q. You are still paid the – you are still paid the same amount even though you worked under 40 hours that week?
> A. Yes, I understand that. I understand that. I understand that. I understand all of that.
> Q. And that's different from before . . . where you were only paid for the actual hours that you worked.
> A. Uh-huh. Yes. Yes. But I don't understand it. This is too much.

Mr. Garcia's Depo. at 43-44. Mr. Garcia further testified that the only purpose of his suit related to his overtime wages:

> Q. What was it that made you believe that you had grounds to sue the defendants?
> A. Working overtime for three dollars and a penny. Three dollars and a penny for overtime.
> . . .
> Q. When did you decide to pursue it?
> A. When they started this monkey business. . . .
> Q. What monkey business are you referring to?
> A. Doing this. Paying you three dollars and something for so many hours of work.
> Q. So when did you first realize you were getting paid that?
> A. Long time ago. Ever since the first time I saw it. . . .
> Q. So you understood then that they were paying you the 350 plus half time for your overtime hours?
> . . .

> A. Teresita [Mr. Nichols' assistant] told me, Tito. She was telling you must be very happy now you are going to earn this much, plus overtime. Plus the overtime. She didn't explain. She didn't say anything else more than that.
> Q. And after you had that coversation with her and received your first pay check, did you see that the pay check was different from what you understood?
> A. Yes.
> Q. And did you talk about that with anyone?
> A. No. No way.
> Q. So after your checks kept coming showing the 350 plus the half time . . . did you realize that was how Port Royale was paying you?
> A. That misery. That moment when I saw the first time, no. You don't have a choice. But I didn't have a choice because I have to work to live. And the same this is happening to everbody that's working there.

Garcia Depo. at 61 - 63.

> Earlier Mr. Garcia testified as follows:
>
> Q. Well, if you take a look at your pay check it will say regular pay, $350. And then it says half time. Half time.
> A. That's what I can't swallow.

*Id.* at 40.

According to his own testimony, then, Mr. Garcia had a firm understanding (1) of Port Royale's switch to a weekly salary; (2) that he would receive $350 per week regardless of the hours he worked; and (3) that he would receive only half-time for each hour worked over 40 hours. In his response to the defendants' summary judgment motion, Mr. Garcia focuses on the fact that no one at Port Royale clearly explained that he would receive $350 a week regardless of the hours worked, and argues that Mr. Nichols' explanation that Mr. Garcia "was going to get paid a minimum of $350 and that it was going to be based on a 40 hour work week and anything over 40 hours he would get half-time" did not comply with the §778.114. In other words, he says that a clear mutual understanding as to the FWW method did not exist. *See* Plaintiff's Response at 12.

This argument, however, is unavailing. First, Mr. Garcia's testimony makes clear that after Port Royale explained the FWW method to him, and after he signed the salary agreement and accepted its terms -- namely that he would receive $350 per week regardless of the hours worked, and that he would receive half-time for each additional hour worked over 40 hours -- and after receiving detailed weekly pay stubs, he was well aware of the fixed salary compensation plan, and

that he would receive $350 per week regardless of the hours worked. Second, having reviewed Mr. Nichol's deposition testimony in its entirety I do not see any deficiency in his explanation of the FWW method to Mr. Garcia or any failure on the part of Port Royale to convey to Mr. Garcia the particulars of the FWW method. Mr. Nichols testified as follows:

> Q. What did you tell [Mr. Garcia] after you gave him this [salary] agreement?
> A. I don't understand the question, say it again.
> . . .
> Q. My question is, did you tell him anything in addition to what is written in that agreement when you gave it to him?
> A. I told him he was going to get paid a minimum of $350 and that it was going to be based on a 40 hour work week and anything over the 40 hours he would get half-time.
> Q. Okay
> A. But during the summer our [sic] weeks that he worked less than 40 hours he would still be paid a minimum of $350.
> Q. And did you tell him anything else about the agreement other than that?
> A. No.
> Q. So if I understand correctly, when you gave him the fluctuating work week agreement you told him that he would be getting a fixed salary of $350 a week, correct.?
> A. Correct.
> Q. For 40 hours worked, right?
> A. For 40 hours, correct.
> Q. And that he would be paid half-time for all of the hours that he worked above 40 hours a week?
> A. Correct.
> . . .
> Q. All right. Now, did you tell him anything else besides that?
> A. No.
> . . .
> Q. Okay. Now, did you explain to Mr. Garcia or when you told him that he would be getting half-time for the hours that he worked in excess of 40 hours per week, did you tell him how much that half-time would constitute or be.
> A. No.
> . . . .
> A. I told him it is going to be whatever the formula, I told him there is a formula and whatever it was, because each week it would be different, but I didn't elaborate on any dollar amount, no.

Nichols Depo. at 6-9.

14

The regulations require that "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the ours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period ..." 29 C.F.R. § 778.114 (a). I see no material difference between what the regulations say and what Mr. Nichols' explained to Mr. Garcia -- that Mr. Garcia "was going to get paid a minimum of $350 and that it was going to be based on a 40 hour work week and anything over the 40 hours he would get half-time." Consistent with the FLSA, Mr. Nichols conveyed in his explanation that Mr. Garcia would receive a fixed salary, that the workweek was made up of 40 hours, and that he would receive half-time for each hour worked in excess of 40 hours. I fail to see, and Mr. Garcia has failed to show, how Mr. Nichols' explanation, together with Mr. Garcia's signing of the salary agreement, his testimony that he understood he would receive a fixed salary regardless of the hours worked, and his examination of his weekly paycheck stubs clearly reflecting the FWW, creates a genuine issue of material fact as to whether a clear mutual understanding existed about the FWW method. Put simply, Port Royale conveyed the "essential feature" of the FWW -- namely that "the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours -- in several ways: via the salary agreement, which each employee had to sign if he wished to stay with Port Royale; via verbal explanations by Mr. Nichols and his staff; and via the weekly pay check stubs.[6] *See Davis*, 2003 WL 21488682 at *3 (regular paychecks serve as a "regular lesson" about how the FWW plan operates.); *Griffin*, 442 F.3d at 716 (holding that employee memorandum explaining the fixed salary which each employee had

---

[6]Notably, the mutual understanding requirement is limited to the understanding that an employee will be paid a fixed salary for all hours worked, apart from the on-half overtime premium, and does not extend to the overtime calculation. *See Davis*, 2003 WL 21488682 at *2. "Neither the regulation nor the FLSA in any way indicates that an employee must" in addition to understanding the he or she will receive a fixed salary regardless of the number of hours worked and half time for each hour worked above 40, also understand "the manner in which his or her overtime pay is calculated." *Bailey v. County of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996); *Samson*, 242 F.3d at 636-37 ("We decline to expand the 'clear understanding' requirement of section 778.114 to include the details" of how the FWW is administered). Thus, liability adheres only to the extent that there is not a clear mutual understanding as to that which § 778.114 requires – namely that the fixed salary is paid for all hours worked regardless if the employee works more than or less than 40 hours (except of course for the overtime premium).

15

to sign, employer's verbal explanation, and regular paychecks all demonstrated that a clear mutual understanding existed between the employee and employer). Mr. Garcia has provided no contrary evidence to create an issue of fact. *See Yadava v. Coleman Oldsmobile, Inc.*, 538 F.2d 1206, 1207 (5th Cir. 1976) (approving use of FWW method where employee "understood that she was to receive a straight salary of $1,000 per month for whatever hours she worked").

The record illustrates that Mr. Garcia had plenty of opportunity to understand the basics of the FWW, and furthermore, that he did indeed come to understand, via a combination of verbal explanations by Port Royale and his weekly pay stubs, that he would receive $350 per week regardless of the number of hours worked plus half-time for those hours worked in excess of 40 hours. Indeed, no reasonable juror could conclude otherwise on this record. Having failed to introduce evidence tot he contrary, Mr. Garcia cannot overcome summary judgment on his claim that a clear mutual understanding did not exist, and therefore, that the FWW did not apply.

### CONCLUSION

For the reasons discussed, the defendants' motions for summary judgment are GRANTED. Mr. Garcia has failed to show that he did not have a clear mutual understanding of the fluctuating workweek compensation system Port Royale instituted under §778.114, and the record establishes that Mr. Garcia was properly paid overtime under the FWW schema. A final judgment will be issued separately, as will an order on the defendants' motion for Rule 11 sanctions.

DONE and ORDERED in chambers in Miami, Florida, this 2nd day of February, 2006.

                                                    Adalberto Jordan
                                                  United States District Judge

Copy to:     All counsel of record